LEE (JELISON v.). See Case No. 7,256.

---

## Case No. 8,191.

### LEE v. KAUFMAN et al.

[3 Hughes, 36; 24 Int. Rev. Rec. 90; 17 Alb. Law J. 237.][1]

Circuit Court, E. D. Virginia. March 15, 1879.

SOVEREIGNTY—SUIT AGAINST OFFICER OF GOVERNMENT—TITLE CLAIMED BY UNITED STATES—INTERVENTION BY GOVERNMENT.

As courts of justice may take cognizance of actions affecting the personal property of the government of a sovereign power whenever the service of mesne process before adjudication does not involve the seizure of the property out of the hands of its officers, even though the proceeding looks to a judgment, final execution upon which if issued would dispossess the government; so they may take cognizance of actions concerning real property, especially in statutory ejectments, where the forms of law and the practice of the courts admit, under statutory provision, of a trial of the right or title upon a summons, and appearance of the occupant of the land, where he is an officer or agent of the government and his occupancy is not interfered with; and this is especially so when the government voluntarily intervenes to assist such officer or agent in defending its title to the land.

[Cited in Adams v. Bradley, Case No. 48; Baltimore & O. R. Co. v. Allen, 17 Fed. 177.]

The plaintiff [George W. C. Lee] sued in ejectment for the recovery of the Arlington estate, near Alexandria. The suit was brought in the circuit court of Alexandria, and removed into the circuit court of the United States, on petition of the defendants [Frederick Kaufman, R. P. Strong, and others] by procurement of the United States. It was

---

[4] [From 2 Cent. Law J. 495.]

[5] [From 2 Cent. Law J. 495.]

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 24 Int. Rev. Rec. 90, and 17 Alb. Law J. 237, contain only partial reports.]

heard upon suggestion made by the attorney-general of the United States, that the property was claimed by the United States on a title of record, and that the United States could not be sued; and upon his motion for the dismission of the proceeding, and the plaintiff's demurrer to the attorney-general's suggestion.

W. J. Robertson, Legh R. Page, and Francis L. Smith, for plaintiff.

L. L. Lewis, Dist. Atty., and W. Willoughby, for the United States.

Samuel F. Phillips, U. S. Sol. Gen., attended in person.

The facts bearing upon the question of jurisdiction were stated by HUGHES, District Judge, in his opinion on that branch of the case, as follows:

As necessary to an intelligent understanding of what is to be decided, I must set out the facts of the case as shown by the record. I will connect with them some others derived aliunde chiefly from the briefs of counsel, which are inseparable from those exhibited in the pleadings, but to which I shall allow no technical value, and which will be seen not at all to influence the judgment of the court. I conceive the facts of the case to be as follows:

The late G. W. Parke Custis was the owner in fee of the tract of eleven hundred acres of land which is the subject of this controversy. It is known as the "Arlington Estate." It is situated south of the Potomac river, in Alexandria county, Virginia, and forms a conspicuous object in the landscape which presents itself to the eye in looking southward from the capitol at Washington. I need not add that it is an estate of considerable value, and of profound historical interest. Mr. Custis, who died in 1857, devised this estate to his only child, Mrs. Mary A. R. Lee (wife of General Robert E. Lee), to be held during the term of her natural life, and at her death to the present plaintiff, G. W. Custis Lee, to be held in fee. During the Civil War this estate, with the Arlington mansion, was unoccupied by its owner, Mrs. Lee, who was then living; and the title did not pass to her son until 1873, the date of her death. On the 5th of August, 1861, the United States congress passed "An act to provide increased revenue from imports to pay interest on the public debt, and for other purposes," and on the 7th of June, 1862, passed "An act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes," and on the 6th of February, 1863, enacted still another law, entitled "An act to amend an act entitled 'An act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes.'" The first-named law imposed a direct tax of $20,000,000 upon the United States, and apportioned to Virginia the sum of $937,552.67. The tax imposed on Arlington was $92.07. On the 11th day of January,

1864, the whole estate of eleven hundred acres was sold for the payment of this tax by John W. Hawxhurst, Gillett F. Watson, and A. L. Foster, who were the duly appointed and confirmed direct tax commissioners of the United States for Virginia. The price bid by the government was $26,800, an amount exceeding the means of any friend of the owner who might have desired to buy in the property for him. It was so bought in by the tax commissioners under authority of that clause of the act of congress of February 6th, 1863, which empowered the government, at such a sale as this was, to purchase lands which might be selected by the president "for government use, for war, military, naval, revenue, charitable, educational, or police purposes." The United States at once took possession of the estate, and has held it ever since; no part of the purchase-money which would have remained, after deducting the tax, having ever been paid over either to the life tenant or remainderman. The estate is now occupied by Frederick Kaufman, R. P. Strong, and about two hundred other persons. Against all these by name, as defendants, the plaintiff, in April last, brought two actions of ejectment (now treated as one) in the circuit court of Alexandria county, Virginia, having postponed his suit until within the last year of the period of five years, after which it would, in some of its objects, have been barred by the statute of limitations. The action was statutory ejectment under chapter 131, Code Va. The notice in ejectment was served personally on each occupant, and the declaration was filed at the May rules following. In due course of procedure the defendants all appeared by counsel and demurred and pleaded, their plea being the general issue authorized by the statute. The cause was thus matured for trial at the term of the state court, which was held in July, 1877. Before the commencement of that term, however, the defendants filed a petition here for the removal of the cause into this court from the state court. The petition was founded upon section 643 of the Revised Statutes of the United States, which authorizes any officer of the United States, or any person holding estate by title derived from any officer of the United States, when sued in a state court by any proceeding affecting the validity of any revenue law of the United States, to remove the cause into a circuit court of the United States.

Among the recitals of their petition, the defendants say: ". . . Your petitioners say that they do not claim the title to said land, or interest therein, except as follows, to wit: A certain portion thereof, consisting of about two hundred acres, more or less, is in charge of the war department of the United States, and is being used as a national cemetery for the burial of deceased soldiers and sailors of the United States; and the said defendant Kaufman is a superintendent thereof, under the directions of said war department. The remaining portion of said premises is set

apart as a military post, and reserve connected therewith, of the . United States, and is now in charge of the 'defendant Strong, who is an officer of the United States, and occupying the same under orders of the war department and in obedience to an order thereof, of which the following is a copy, to wit: 'War Department, Adjutant-General's Office, Washington, D. C., July 27, 1872. The Quartermaster-General U. S. Army—Sir: The secretary of war directs that all that part of the Arlington estate outside the walls of the national cemetery be considered a military reservation pertaining to Fort Whipple, Virginia, and under the immediate charge of the commanding officer of that fort. The secretary has approved your recommendation that those persons who have crops on the proposed sites for the new buildings shall be compensated therefor from the contingencies of the army. A board of survey has assessed the total amount at $540, which has been ordered to be paid to the parties; also that the copy of the survey describing the metes and bounds of the Arlington estate be filed in the quartermaster-general's office as record of a military reserve, and be recorded in the proper land record office in Alexandria, Virginia. Very respectfully, your obedient servant, (Signed) E. D. Townsend, Adjutant-General.' That such of said defendants, except Strong and Kaufman, as are upon said premises, occupy the same not as tenants, but under permission of the officer in charge of said military reservation, which is in writing or printing, and is substantially as follows: 'Fort Whipple, ——, 187–. This is to certify that —— permitted to occupy —— acres of —— on the Arlington reservation until ——, 187–. No rent will be charged for this occupation of the reservation to that date. (Signed) ——, Officer in Charge.' "

Upon the filing of this petition, a writ of certiorari was issued hence to the clerk of the Alexandria circuit court, under which a copy of the record in the suit was certified here; the cause, when brought here, being ready for trial on issues joined of law and fact. The following proceedings were thereupon had in this court: "In the Circuit Court of the United States, for the Eastern District of Virginia. G. W. C. Lee v. Frederick Kaufman, R. P. Strong, and Others. In Ejectment. And now comes the attorney-general of the United States and suggests to the court, and gives it to understand and be informed (appearing only for the purpose of this motion) that the property in controversy in this suit has been for more than ten years, and now is, held, occupied, and possessed by the United States, through its officers and agents, charged in behalf of the government of the United States with the control of the property, and who are in actual possession thereof as public property of the United States for public uses, in the exercise of their sovereign and constitutional powers, as a military station and as a na-

tional cemetery, established for the burial of deceased soldiers and sailors, and known and designated as the 'Arlington Cemetery,' and for the uses and purposes set forth in the certificate of sale, a copy of which, as stated and prepared by the plaintiff, and which is a true copy thereof, is annexed hereto and filed herewith under claim of title, as appears by the said certificate of sale, and which was executed, delivered, and recorded as therein appears. Wherefore, without submitting the rights of the government of the United States to the jurisdiction of the court, but respectfully insisting that the court has no jurisdiction on the subject in controversy, he moves that the declaration in said suit be set aside, and all the proceedings be stayed and dismissed, and for such other order as may be proper in the premises. Charles Devens, Attorney-General."

Then follows the certificate of sale referred to, setting out in full recital the tax title under which the government claims. Upon this suggestion the following rule was issued: "In the Circuit Court of the United States, for the Eastern District of Virginia. George W. C. Lee v. Frederick Kaufman, R. P. Strong, and Others. In Ejectment. Suggestion having been made by the attorney-general of the United States that the property in controversy in this cause is in the use and possession of the United States under claim of title of record; and such suggestion having been filed, together with a motion for those reasons to set aside the declaration and dismiss the proceedings, and for such other orders as may be proper, as more fully appears by such suggestion and motion on file in the office of the clerk of this court at Alexandria. Ordered, that a rule issue requiring the plaintiff to show cause at the court-house in Alexandria, on the 4th of September, 1877, or as soon thereafter as counsel can be heard, why such motion should not be granted, provided that such rule be served upon the plaintiff or his counsel on or before the 1st of August, 1877. R. W. Hughes, Judge. Norfolk, 19th July, 1877."

In response to this rule the plaintiff filed the following answer and demurrer: "In the Circuit Court of the United States for the Eastern District of Virginia. George W. C. Lee v. Frederick Kaufman, R. P. Strong, and Others. The plaintiff, not waiving, but still so far as he may lawfully do, insisting upon his motion to remand the cause to the state court, for answer to the summons requiring him to show cause why the motion of the attorney-general of the United States to set aside the declaration and to dismiss the proceedings in the above-entitled cause, for the reasons set forth in the suggestion of the said attorney-general, which has been filed therein, should not be granted, says, and for cause shows: 1st. That said suggestion should be dismissed as not being a proper mode of making an objection to the jurisdiction of the

court. 2d. That said suggestion and matters therein contained, in manner and form as they are therein set forth, are not sufficient in law to sustain said motion or to show that any relief whatsoever should be granted under the application made by said attorney-general; and that the plaintiff should not be required to make any further or other answer thereto. 3d. If this, his demurrer, should be overruled, and he should be required to make further answer to said suggestion, the plaintiff says: That he does not admit it to be true, as set forth in said suggestion, that the United States are in possession of the property in controversy in this suit by their officers and agents charged on behalf of the government with the control of the property. One of the defendants, Maria C. Syphax, is in possession of and holds a portion of said property under an act of congress, approved on the 12th of June, 1866, entitled 'An act for the relief of Maria Syphax' (14 Stat. p. 589, c. 121), whereby the title to seventeen acres and fifty-three one-hundredths of an acre, be the same more or less, being a part of the property in controversy in this suit, was released and confirmed unto the said Maria Syphax, being one and the same person. The plaintiff is informed, and believes it to be true, that a very large majority of the other defendants are in fact tenants of the government of the United States, rendering valuable services in work and labor done and performed by them for said government in consideration of being permitted by it to occupy and use the lands of which they are respectively in possession. The plaintiff further says that the United States have no other or further title to the property in controversy in this suit than that which was acquired by them as purchasers at a sale thereof for taxes, made by John Hawxhurst, Gillett F. Watson, and A. Lawrence Foster, as United States direct tax commissioners for Virginia, and shown by their certificates of sale, a copy of which is filed with said suggestion; and the consent of the state of Virginia has never been obtained to such purchase. The plaintiff, therefore, denies it to be true, as is set forth in said suggestion, that the property in controversy in this suit has been or is now held, occupied, or possessed by the United States, through their officers and agents, charged in behalf of the government of the United States with the control of the property, and who are in actual possession thereof as public property of the United States for public uses in the exercise of their sovereign and constitutional powers, and calls for full proof of each and all of said allegations. G. W. C. Lee."

Thus the suit is here, not only on the issues of law, made up before the removal from the state court, but on the suggestion of the attorney-general, and the plaintiff's demurrer to the suggestion and answer to the rule nisi. Such are the facts in the case as it stands upon record. It is now heard upon the plaintiff's demurrer to the suggestion, upon the whole record, up to and including the demurrer. And on that demurrer the first inquiry is: Whether it is competent for the government, in the person of its chief law officers, to appear by suggestion at all? And the second is, assuming that the suggestion is a proper form of proceeding, does it set forth such a case in connection with the antecedent record as, conceding the facts alleged to be true, entitles the government to a dismissal of these proceedings, in pursuance of the motion of the attorney-general?

Counsel on either side submitted elaborate briefs and arguments. It is deemed due to the importance of the question to give that of Messrs. Willoughby and Lewis, counsel of the United States, nearly in full, as the decision was adverse to them.

### Argument of the Counsel for the United States on Motion to Dismiss.

This action is brought against the parties above named, who are officers of the United States, and nearly two hundred others, who are charged to be in the occupation of the premises in controversy; and which is the estate known as the "Arlington Estate," in the county of Alexandria. The record shows that there has been what is equivalent to inquisition and office found. The supreme court of the United States say, in reference to a sale under this act, in the case of Bennett v. Hunter, 9 Wall. [76 U. S.] 336, "The sale was the public act, which was the equivalent of office found." From these facts it appears that the United States is in possession of the property in question; that it is in such possession under claim of title of record, valid upon its face, and that it is being used for proper and necessary governmental purposes. Under these circumstances it has been deemed proper to suggest to the court that it has not jurisdiction to take any action which will tend to disturb this possession of the United States, under those principles which will not allow a suit by a citizen, as plaintiff, against the government, as defendant, or against its property, especially when such property is held and used as this is held and used. For these reasons the motion is made to dismiss this suit.

The inquiry will doubtless be made whether the mode we have selected is a proper one by which to bring this question before the court. The answer to this inquiry will be seen in authorities and precedents which I shall hereafter cite in full, but which I do not, in the order of my argument, wish now to anticipate. For the present it may be sufficient to call attention to the familiar principle, that if the court is apprised by any authentic evidence that it has not jurisdiction of the case before it, it will refuse to proceed until it is satisfied upon that point. In some cases it may be necessary to plead want of jurisdiction. When such plea is made, that question is first to be determined. But when the subject-matter of the suit is without the juris-

diction of the court, and this fact comes to the knowledge of the court in any way, it will, either on motion, or suggestion, or even ex mero motu, at once refuse to proceed. Such is said to be the law in Heriot v. Davis [Case No. 6,404], and cases there cited. In the case of The Pizarro [Id. 11,199], cited in the United States Federal Digest, at page 506, suggestion by the United States district attorney was held the proper mode to bring to the attention of the court that the suit before it was that of a private suitor against an armed ship of a friendly power, on account of which it could not take jurisdiction. In Maxfield v. Levy [Id. 9,321], a rule was issued to show cause why an ejectment case should not be dismissed from the record upon a suggestion that the court had no jurisdiction, for the reason that a conveyance had been made to a non-resident of the state for the sole purpose of giving jurisdiction. The truth of this suggestion was shown upon a bill for discovery, upon which the rule was made absolute. In the case of The Exchange, 7 Cranch [11 U. S. 116], a suggestion was made at the instance of the attorney-general that the property in controversy was a public armed vessel in the service of the French government. Issue was taken to such suggestion and a hearing had, upon which, it having been ascertained that such suggestion was well founded, the case was for that reason dismissed. Upon the record thus made the case was appealed to the supreme court, and was by that court heard and decided. In Doe v. Roe, 8 Mees. & W. 579, which was an action of ejectment against property held by the crown, and which I will cite fully hereafter, a rule was made to dismiss, upon suggestion filed by the attorney-general, and which was made absolute.

We are now prepared, I think, to discuss the proposition that the court has not jurisdiction of this case, for the reason that it is a suit by a private citizen against the property of the United States, claimed to be held under a title of record, and used for governmental purposes. The object of the suit is to establish the right of the plaintiff to the possession of the property in question, and to put him into the actual possession thereof; which can be done only by invalidating this record-title of the government, and putting the government out of possession. Whatever may be regarded as the form or nature of the action, it cannot be denied, nor the fact disguised, that the substantial controversy in this suit is between the plaintiff on the one side and the United States on the other. The plaintiff in accordance with the statute, which requires him to state the nature of his title (Code Va. 1873, p. 959), claims in fee. According to the statute (Id. p. 962): "The verdict shall specify the estate found in the plaintiff, whether it be in fee or for life, stating for whose life, or whether it be a term of years, and specifying the duration of such term. The judgment for the plaintiff shall be that he recover the possession of the premises according to the verdict of the jury." He is thus seeking not merely possession, but a judgment as to the nature of his title, which he claims to be in fee. In both respects his claim is in direct opposition to the interests and claims of the United States; and it cannot be supported except by overthrowing the apparent title of the United States, and evicting them from their present possession; for it is a philosophical axiom that two bodies cannot occupy the same space at the same time.

It is manifest that this suit was intended to be brought in pursuance of the provision of the statute, which says: "The person actually occupying the premises shall be named defendant in the declaration." Code Va. 1873, p. 959. It will, therefore, doubtless be urged that inasmuch as the United States is not named as a party defendant the suit can be maintained, regarding the defendants named as the occupants within the meaning of this statute. Now, for the purpose of showing that a suit in ejectment is substantially a proceeding in rem, a suit against the property rather than as against the parties named, or as against the parties who may happen to be in the occupation of the property at the commencement of the suit, I trust I may be justified in briefly recurring to the nature of this familiar action. This mode of proceeding was a device of the courts, about two hundred years ago, at Westminster. The plaintiff, who was out of possession, and could not therefore convey the property, made a formal entry upon the land, and executed a lease to a fictitious person, usually called John Doe. This lessee was then supposed to be ousted from his fictitious possession by another fictitious person, sometimes called Richard Roe. Doe, the lessee, then commences a suit against Roe, on account of this ouster, and claims the judgment of the court, that he be restored to his possession, from which he has been ousted. The defendant, then, who is called the casual ejector, having no special interest in the matter, sends a notice or warning, to the person who is in the occupation of the land, that these proceedings are going on, that a declaration will be filed at a time named, and advises him to attend to it, as otherwise judgment will be taken by default. On proof of the service of such a notice, if no one appeared, judgment was taken by default and process issued, putting the plaintiff in possession, and, of course, putting the occupant out of possession. Such a suit, as will readily be seen, was not a suit, in form, against the occupant. He was not even named as defendant. As Lord Mansfield said, in Fairclaim v. Shamtitle, 3 Burrows, 1292: "In form it appears as a trick between two to dispossess a third by a sham suit and judgment." The occupant had a mere notice, not a writ or process. He was not made a party to the suit by such notice. If he wished to prevent a process from issuing, which would

put him out of possession, he was compelled to apply to the court for leave to show cause why this should not be done. This was granted to him only upon terms, to wit, that he should confess the entry of the plaintiff, his lease, and the ouster, leaving only the question of right of possession to be tried. But if the occupant had no special interest in defending the possession, then any person having title to the property, consistent with his occupation, and interested in preventing the recovery of the plaintiff, was allowed to come in and defend upon the same terms. This privilege existed at common law, and although a statute was passed giving such right to landlords of the occupant, yet this has been uniformly construed as permitting any person, having a title consistent with that of the occupant, to show cause why the plaintiff should not recover possession. Id.; Tyler, Ej. 447, and cases there cited. But formerly, notwithstanding the introduction of these new parties, the suit was carried on in its original style. This shows that the proceeding was regarded as not an action in personam, but in rem. The object was, not a judgment against any person, but it was for the possession of the res, the thing in controversy. No judgment was rendered against the person. No person was concluded by the judgment. The occupant, or his landlord, even though he had defended the suit, could immediately commence another suit. The only conclusive result of judgment for the plaintiff was to put him into possession. Notice was served upon the occupant, because that appeared to be the best mode of giving notice to all parties interested. The suit could be maintained even when there was no occupant, and it did not abate by the death of the occupant. All these considerations show that the persons named as defendants are of comparatively small importance in the suit, and that such suit is, in substance, a suit against the property itself, rather than against the nominal defendants. The real defendants are those interested to prevent a change of possession, whether they be the occupants, their landlords, or any other person, having a right to defend the course. All the text-writers agree that the action of ejectment is a real action, in distinction from a personal action. "In a real action, the proceedings are in rem, for the recovery of real property only." Tidd, Prac. 1. In Runn. Ej. p. 4, the author says: "By the ancient law in ejectment, the plaintiff recovered only damages, the true measure of which was the mesne profits; the term was not recovered. When, however, it became established that the term should be recovered, then the ejectment had the effect (though by no means the form) of a real action, the proceeding was in rem, the thing itself, the term, only, was recovered, with nominal damages, but not the mesne profits." True, ejectment has been styled an action of trespass, founded on tort. This has reference to the ouster, which was one of the fictions that need not be proved. It requires another sort of action for the continued trespass; to wit, the action for mesne profits. Now, the statute of Virginia has preserved the essential principles of this action, though it has in some respects simplified the proceedings. This statute is a copy of the New York statute upon this subject. The revisors, in recommending this statute to the legislature of New York, say, in their note, they "have carefully adhered to the leading principles of the action, so as to make little or no alteration, except in the form of the proceedings." Instead of having a fictitious defendant, the statute requires that the person occupying the premises shall be named as defendant. It says, also, that the "real claimant shall be named as plaintiff, and all the provisions of law concerning a lessor of the plaintiff shall apply to such plaintiff." Code 1873, p. 959. Suit is commenced, not by a writ or process, but a declaration is served, and notice that such declaration will be filed. Upon filing the declaration the plaintiff is entitled to a rule to plead. But this rule is a mere entry made in the office of the clerk. It is not required to be served. Judgment for the plaintiff is that he recover possession according to the title he proves. This judgment is conclusive upon the parties who appear and defend the suit as to the right established in the action. It would not be a bar to such persons who do not appear, except, perhaps, as to the person upon whom the notice is served; but it would be conclusive upon all parties until it is set aside by a subsequent action. Parties who do not appear would be put out of possession and their title adjudged to be invalid, and it would be so held until other proceedings or a subsequent ejectment set such judgment aside.

The first effect of judgment for the plaintiff in this case, if the United States do not appear, would be a process to divest them of possession and title, which they could not again obtain except by another suit in ejectment, in which they would be the plaintiffs. By the prosecution of this suit the United States is compelled to appear and defend, or to allow their possession to be taken from them, and their title to be adjudged to be invalid, if this suit is proper to be maintained. The judgment operates upon the property, irrespective of the parties named in the suit. It thus really affects those who are interested in the title and possession, whether they appear as parties or not. In this respect it is analogous to a proceeding in admiralty against a vessel or against property for the violation of a revenue law, or an attachment against personal property, which may be condemned and sold without reference to the real ownership, or to the owners being named as parties to the cause. What I claim is, not that this is a direct suit against the United States, but that it is a suit, in substance,

against its property, and not, necessarily, against the defendants named, the mere occupants for the time being. They have no right or claim. It is not simply to turn them out that this suit is brought. The real object aimed at is to remove the hands of the United States. It is the title, interest, and possession of the United States which is attacked. In fact I do not believe that a soldier or officer of the United States, who is in charge of property by command of the executive authority, and liable to be removed in a day, is an "occupant" in the sense contemplated by the statute, no more than a mere servant of a tenant would be such occupant, who could not be made a party to such suit. 1 Chit. 116. The real occupant is the United States. 11 Abb. Prac. 97. Let there all along be borne in mind the legal maxim, "Nemo potest facere per obliquum quod non potest facere per directum." The principle underlying all the authorities relating to the jurisdiction of courts, where their action may affect sovereign power, is that the sovereign power of any nation is supreme; that it is not the subject of judicial power; that it will not permit process against itself either directly or indirectly, or allow its operations or instrumentalities to be affected or disturbed, except by its own consent. Sovereign power is above the courts. It is their creator and master. It cannot permit coercion by judicial process. It cannot allow the supposition that it is capable of doing wrong. The idea contained in the maxim that the king can do no wrong is not peculiar to England. The basis of that maxim is that sovereign power cannot be regarded as capable of wrong, and I will not permit it to be said unchallenged that the dignity and sovereign power of the people of the United States are in any respects inferior to the like attributes of the king of England, or to those of any other sovereign on earth.

Let us now consider some of the authorities relating to the subject before us; and I will begin with quoting from English authors and judicial decisions.

Blackstone, in his Commentaries (volume 3, p. 236), says: "The common-law methods of obtaining redress or restitution from the crown, of either real or personal property, are: 1. By petition de droit, or petition of right. 2. By monstrans de droit, manifestation or plea of right; both of which may be preferred or prosecuted either in the chancery or exchequer." See, also, 5 Bac. Abr. tit. "Prerogative," 571. This petition it is well understood, must be presented to the sovereign, who thereupon, by the proper officer, indorses his permission that the right may be tried. In 4 Coke, 55a, known as "Sadler's Case," the court resolved: "At common law, when the king was seized of any estate of inheritance or freehold, by any matter of record, were his title by matter of record judicial, as attainder; ministerial, as by office; or by conveyance of record, as by fine, deed enrolled, etc.; or by matter of fact, and found by office of record on oath, as by alienation in mortmain, purchase by alien, etc., he who had right was put to his petition of right, in nature of a real action, to be restored to his freehold and inheritance." In Stamford on Prerogatives (72a, b), the author says: "And this method of proceeding is proper, where the king seizes the goods or lands of a subject without due order of law, or enters into the lands of another without title or office found." Cited in Bac. Abr. tit. "Prerogative." Monstrans de droit was allowed where the right of the party, as well as the right of the crown, appeared upon the same record, or by another record of as high a nature as that upon which the right of the crown appeared. 4 Coke, 55a, b. "At common law, where the king was entitled by office, though untruly found, the party could not have a traverse to the office, nor could he avoid it without petition." Id. 56a; Stamf. Prerog. 606; 6 Com. Dig. tit. "Prerogative," 67. "If the king be seized of lands or tenements by matter of record, he cannot be disseized or ejected; but if any one enters, he will be an intruder upon the king's possession. And, therefore, if a man enter upon the king's demesnes, and take the profits, it will be an intrusion; for, as the king takes only by matter of record, he cannot be ousted of possession save by matter of record. An intruder cannot make a lease to maintain an ejectment; nor can he maintain trespass." Id. 67, 64. In the Year Books (30th Ed.) 171, as early as the year 1302, we find the following recorded: "To a writ of right brought against the abbot of Saint Serle, it was answered that the tenements were seized into the king's hands, by reason whereof the abbot could not and ought not to answer. (Wescott.) Although the tenements are seized into his hands, you are tenant of the freehold. Judgment, if you ought not to answer. (Brompton.) He ought to answer; but inasmuch as we cannot entertain the suit while the tenements are seized, I advise that you who wish to sue for them do send to court to purchase permission, for we will hold no such plea before we are commanded so to do."

The following extracts are taken from the opinions in a very celebrated case of The Bankers, reported in 14 How. State Tr. p. 28, at about the year 1700: "There is nothing in the law so fenced and guarded and so sacred as the king's inheritance. Where that is concerned there must be petition de droit, an inquisition found, besides searches, etc. So careful is the law of the king's inheritance and revenue. As the common law stood, wherever a title for the king was found by matter of record, though it was false, the party could not traverse it; so, where a title was found for the king which was true, but it was disclosed in the record

that the subject had a good right which would avoid the title found for the king, yet, in that case, the subject could not be admitted to show it, but was so far concluded as to be put to his petition of right. Monstrans de droit was given by the statute 36 Edw. III., and did not lie at common law." Page 78. "Suppose a man hath a rent-charge, or a rent-service, or other rent issuing out of land by prescription or grant, and this land comes to the king by grant or forfeiture, in all such cases the owner of the rent is put to his petition to the king, and hath no other remedy whatsoever." Page 81. "By all the authorities (citing a large number), and by many others which I could cite, both ancient and modern, that if the subject was to recover a rent, or annuity, or other charge, from the crown, whether it was a rent or annuity originally granted by the king, or issuing out of lands which by subsequent title come to be in the king's hands, in all cases the remedy to come at it was by petition to the person of the king; and no other method can be shown to have been practiced at common law. Indeed, I take it to be generally true that, in all cases where the subject is in the nature of a plaintiff, to recover anything from the king his only remedy at common law is to sue by petition to the person of the king." Pages 81, 82.

In Barclay v. Russell, 3 Ves. 436, the controversy was in regard to some stocks in bank in London. Some records produced showed an apparent title in the crown. The attorney-general was present but made no claim to it. As between the parties the court admitted the equity to be plainly with one of them. But the court dismissed the bill, saying that the court could not give judgment because it might affect the interests of the crown suggested by the record. In this case the crown was not a party.

In the following case [In re Goods of George III.], reported in 1 Addams, Ecc. 255, the court refused to make any order, because it might be adverse to the reigning sovereign. The proctor of George III. was cited to show cause why his will should not be exhibited and proved, at the instance of Olive, princess of Cumberland, who claimed to be interested in it as legatee. The court say: "Now, the history of wills of sovereigns from Saxon times, from Alfred the Great down to the present day, has been diligently searched and examined, but no instance has been produced of probate having been taken of the will of any deceased sovereign in the courts, much less of its having been contested against any reigning sovereign." This was a proceeding against the king's proctor, but the court held that it was on that account no less a proceeding against the reigning sovereign. The court had no jurisdiction to make any order affecting the interests of such sovereign. "Where the crown is in possession, or any title is vested in it, which the suit seeks to divest or affect, or its rights are the immediate and sole objects of the suit, the application must be to the king, by petition of right." Mitf. Eq. Pl. 31.

In Hovendon v. Lord Annesley, 2 Schoales & L. 617, where both parties claimed as tenants of the crown, the court say: "There being two grants at different rents, and one grant being more beneficial than the other, the court could not rege inconsulto make a decree; and I doubt whether the court of chancery has jurisdiction in such case to bind the crown, and whether the proceedings should not have been, for that purpose, in the exchequer. The decree ought to set the whole question at rest between the crown and the different claimants, as well as between the claimants. I am called upon to act upon the mere right, and transfer the possession according to the mere right. It strikes me, if the proceedings had been at law in a real action, the defendants might have prayed aid of the king, and there could have been no proceeding without him, as the effect might be to prejudice his right and establish, as his tenant, a patentee at a less rent, and an ouster of the king's fee farmer, to the prejudice of the king. It is clear, therefore, this court could not proceed without the attorney-general, and I doubt whether it could proceed if the attorney-general were a party. . . . . . . . . I take it, however, to be clear that the king's fee farmer cannot be ousted under a prior grant from the crown without the king being a party, unless it be for the benefit of the king that he should be so ousted."

In 1 Anstr. 215, the court—a court of exchequer—say, A. D. 1798: "An ejectment was brought in the court of king's bench, February 10th, 1710, and it was, as to part of it at least, for lands which were part of the queen's estate. There was an application to this court to stay the proceedings, and the parties were heard upon it. The attorney-general appeared, and after the hearing it was put off for a day or two. At length the entry was that an injunction issue pro domina regina, so that the action was not removed, but simply an injunction went to stay the proceedings. And I think I can see why that was. If the action had been removed, the question could not have been tried, even in the office of pleas, because you cannot try the queen's title in an ejectment. The queen was in possession; her hands must be removed by some other course of proceeding than an ejectment, and therefore it was fruitless to think of removing it, and it remained under an injunction. It may be said that it might as well be left to the king's bench to determine that they could not recover the queen's land in ejectment. To be sure they might if the prerogative of the king had not been that the king had a right to prevent that question being discussed there, and to have it dis-

cussed here, and that is what was done." See 5 Bac. Abr. 569, 570. "An ejectment will not lie for lands belonging to the crown, of which the crown is in possession by its officers; the proper · remedy is by petition of right." Adams, Ej. p. 18.

The last case I will cite under this head from the English authorities is that of Doe v. Roe, 8 Mees. & W. 579 (decided in 1841); and I cite this in full because it is a comparatively late case, covers the whole ground, and shows the practice of the government in relation to it. It will be observed that the queen was not a party named in the pleadings, nor made a party by motion or otherwise. This action was brought to obtain possession of a house and lot adjoining Hurst Castle, in which a person by the name of Watson had been placed in 1823 by the authority of the board of ordnance. The attorney-general obtained a rule to show cause why the declaration should not be set aside and proceedings stayed. It was claimed by the plaintiff that by statute the board of ordnance was a corporation, and by statute authorized to sue and defend in actions of ejectment. The action it was urged was not brought to try any title of the crown or to turn the queen out of possession, but to establish affirmatively the title of the plaintiff to this particular piece of land. The attorney-general said: "Such a proceeding is without precedent. You might as well bring ejectment to recover the Tower of London. If the plaintiff have title, he must proceed by petition of right. (Argument stopped by the court.)" Lord Abingdon, C. B.: "This rule must be made absolute. The only doubt I have had was whether the act of parliament of the 1 & 2 George IV. had not some application to this case. It is quite clear that the court could not issue any process to turn the crown out of possession, and the only doubt I had was whether this property was not, by the operation of the act of parliament, in the possession, not of the crown, but of the board of ordnance. But, on looking more fully into the act, my doubt is entirely removed. It does not apply to any of the ancient possessions of the crown, but only vests in the officers of the ordnance, as a sort of corporation, certain messuages, manors, lands, etc., which it recites to have been, at various times, purchased for the use of the crown since the reign of Henry VIII., and we find the board of ordnance in possession for the crown, but not in that sort of possession which is contemplated by the act of parliament. The rule must therefore be made absolute." Alderson, B.: "I am of the same opinion. No ejectment can be maintained against the crown, to turn the crown out of possession, by the authority of the crown itself. The lessor of the plaintiff may proceed by petition of right. The statute 1 & 2 George IV., as it seems to me, has nothing to do with the case; its only effect is to make the prin-

cipal officers of the ordnance trustees for the crown for certain purposes of the ordnance property, so as to prevent the necessity of its being transferred from one set of officers to another. I doubt very much whether the 9th section enables the ordnance to defend an ejectment." Rolfe, B.: "I am of the same opinion. The question may be tested thus: Suppose there were no trial, but judgment went against the casual ejector; then there would only be a writ to turn the crown out of possession, which clearly cannot be. On the other hand, there is no more difficulty in prosecuting a writ of right than an action of ejectment; and although that remedy may be a more dilatory one, it presents no such incongruity and anomaly as in the case of an ejectment, which is to be followed by the issuing of a process that cannot be executed. Rule absolute." Nm. a. Lord Abingdon, C. B., stated also, that he was "much disposed to think that no affidavit was necessary in support of such application, but that it was sufficiently made by the attorney-general appearing on behalf of the crown."

Surely there can be no doubt as to what the law of England is, and has been during its judicial history, in a case like that before this court, and as to the proper practice in bringing before the court the motion we have made. In whatever form the question is presented, whether in a court of law or in equity, in the probate court or the court of exchequer, whether the crown is a party or not, whether the action of the court is to affect the interests of the crown directly or indirectly, the moment the court becomes informed that its action may operate adversely to the interests of the crown without its consent, it invariably suspends all further proceedings. It recognizes the fact that to it the domain of sovereign power is forbidden ground, and that its judicial authority is to be so exercised as not in any manner to trespass upon the prerogatives, property, instrumentalities, or operations of this sovereign power. If this be so, there can be no escape from the conclusion that this suit must be dismissed, unless it can be shown that there is a distinction between the courts of England and this country, or that there are statutes in this country making this distinction, which operate to bring this court to a different conclusion in this case.

Suggestion may be made that the law may be different in this country, on account of the difference between the foundation of courts in that country and in this. It may be said that in England the king is the foundation of justice, and that, for this reason, there would be an impropriety in suing him in his own courts, while here the judicial and executive functions are distinct, and controlled by different branches of the government. A little reflection will clear up any obscurity arising from such suggestion. The real difference is that in England the king is the-

sovereign; here the people are sovereign. In England the courts are of the king; here they are of the people. In both cases the courts are emanations of the sovereign power. In both cases property is held by the sovereign power; and it is on account of this sovereignty that neither can be made defendant in a suit except by consent. But it may be urged that in England there have been more exalted notions of the prerogatives of the king than we have been accustomed to recognize in this country. Now it is true that there are certain prerogatives of the king with which we have nothing to do. Those which pertain to his personal affairs and dignity, in distinction from those which he enjoys for the good of the public, may be regarded differently from what similar prerogatives of the chief executive in this country might be considered. The king may hold property in his personal capacity, in distinction from that which he holds in his sovereign capacity. As to the former the ruling of the courts might not be precedents to guide us in this country. There might, in relation to this, be some idea of kingly prerogative, which would be inapplicable here. But as to those prerogatives which he enjoys as a sovereign for the public good, and as to the property held by the crown for the public, I can conceive of no reason why what is there regarded as essential for the proper and independent enjoyment of such prerogatives and property should not be so regarded in respect to our sovereign, the people of the United States. In relation to these questions of policy, propriety, expediency, and jurisdiction must be of the same nature, and must rest upon the same principles. In our own country the chief executive is not a sovereign. He, in his personal capacity, is subject to the law and to the jurisdiction of the courts substantially the same as a private citizen; and it is in relation to him, in comparison with the king, that we chiefly derive our notions of the greater extent of kingly prerogatives that are not regarded as guides for our action in our courts. But even here, when a suit was attempted to be made against the president, in his official capacity, by the sovereign state of Mississippi, in that august body, the supreme court of the United States, the court would not even allow the bill to be filed. [Mississippi v. Johnson] 4 Wall. [71 U. S.] 475. And it is very suggestive, too, that in this case the court would not allow Andrew Johnson, as a citizen of the state of Tennessee, to be enjoined, recognizing the force of the maxim, "Quando aliquid prohibetur, prohibetur omne per quod devenitur ad illud." When a thing is forbidden to be done, everything having a tendency towards its taking effect is also forbidden. Maxims are axioms which need no reasoning for their support, and this is peculiarly applicable to the case before us. For, if the United States cannot be sued directly for the purpose of defeating its title or destroying its force, can the same object be accomplished by a suit in form against private individuals? The supreme court refused to allow its records to be stained by the suggestion of a similar device.

But let us examine further the authorities of our own courts, to see how these principles have been applied in our own country. Call to mind the great case of Chisholm v. State of Georgia (decided at the very earliest period of our judicial history), reported in 2 Dall. [2 U. S. 419]. It was there held by a divided court, that, by reason of the peculiar language of the constitution, the state has consented to the jurisdiction of the supreme court in a suit against it by a citizen of another state. But such was the indignation and alarm at the consequences of such a construction, that within less than a month after the judgment, the following amendment was proposed by congress, and in due time was ratified by the legislatures of the states: "The judicial power . . . . shall not . . . . extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." What would have been the attitude of a lawyer attempting to maintain the doctrine that the United States was liable to be sued in the court of Alexandria county? In No. 81 of the Federalist, the author says: "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind." In Cohens v. State of Virginia, 6 Wheat. [19 U. S.] 264, the court say: "A sovereign, independent state is not suable except by its own consent. This general proposition will not be controverted. As the United States are not suable of common right, the party who institutes such suit must bring his case within the authority of some act of congress, or the courts cannot exercise jurisdiction over it." U. S. v. Clarke, 8 Pet. [33 U. S.] 444. See, also, [U. S. v. Eckford's Ex'rs] 6 Wall. [73 U. S.] 484; [Field v. U. S.] 9 Pet. [34 U. S.] 201; 1 Story, Eq. Pl. § 69, and note. In Hill v. U. S., 9 How. [50 U. S.] 389, the court say: "No maxim is thought to be better established or more universally assented to than that which ordains that a sovereign, or a government representing a sovereign, cannot ex delicto be amenable to its own creatures, or agents employed under its own authority, for the fulfilment merely of its own legitimate ends. A departure from this maxim can be sustained only on the ground of permission on the part of the sovereign or the government, expressly declared, and an attempt to overrule it or impair it on a foundation independent of such permission must involve an inconsistency and confusion, both in theory and practice, subversive of regulated order or power. Upon the principle here stated, it has been that, in cases of private grievance proceeding from the crown, the petition of right in England has been the nearest approach to an adverse posi-

tion to the government that has been tolerated, and upon the same principle it is that, in our own country, in instances of imperfect land-titles, special legislation has been adopted to permit the jurisdiction of the courts upon the rights of the government."

Even in cases where the United States, as a plaintiff, has instituted suits against private individuals, and has given them in such cases the right of set-off, the court will not permit a judgment against the United States for the excess of such claim over the claim of the United States. Reeside v. Walker, 11 How. [52 U. S.] 290; De Groot v. U. S., 5 Wall. [72 U. S.] 431; U. S. v. Eckford, 6 Wall. [73 U. S.] 484. Neither can a judgment or decree be given against the United States for costs. U. S. v. Boyd, 5 How. [46 U. S.] 29. This principle will not be controverted, and perhaps an apology is due for quoting so extensively to establish so plain a proposition. But I have done so because I desired to show that, in every form in which the question has been presented, our own courts have shown the same sensitiveness to encroaching upon the prerogatives of our sovereign as has been shown by the courts of England in regard to those of her sovereign, and upon the same principles, that the opinions and acts of judges in both countries have been tinctured with the same spirit, and tend to the same results; from which it must of necessity be inferred that, as in England, such spirit and such principles compelled the courts to hold that an action of ejectment would not lie against lands held by the crown, so here lands held by the United States are exempt from such suit, though the United States is not made defendant upon the record.

I think that I have sufficiently established both by the principles of an ejectment suit and by the decisions of the courts, that this suit in ejectment is, at least, a suit against the property of which the United' States is in possession under a title of record; that it is substantially a suit in rem, not a personal action merely against the persons named, but a real action. This being so, let us see what the decisions are as to the property of the United States in such a situation.

In the case of People v. Ambrecht, 11 Abb. Prac. 97, decided in 1859, and cited in Brightly's New York Digest (page 1178) as having been affirmed by the court of appeals of that state, suit was brought at the instance of Gerritt Smith, in ejectment, to recover a portion of the land occupied by Fort Ontario of the United States, at Oswego, and process was served upon a soldier in charge. After saying that such process was not properly served, for the reason that such soldier was not an occupant in the sense contemplated by the statute, and that "the premises, so far as they were occupied at all, were occupied by the United States," W. F. Allen, J., further says: "As the United States are not suable of common right,

the party who institutes such suit must bring his case within the authority of some act of congress, or the court cannot exercise jurisdiction in it. Ejectment, therefore, could not be brought against the United States any more than an action of assumpsit, and it seems to follow that they cannot be indirectly sued in the person of their agents and officers, and the title and claim thus subjected by indirection to the jurisdiction of the state courts. In theory it is unreasonable, and in practice it might prove mischievous by bringing the state and national sovereignty in conflict. The state, by its militia, would be bound to execute the powers of its courts, and give possession, in pursuance of ejectment, while the United States might be disposed to retain possession of its fortifications and barracks by a resort to force, if necessary. Suppose that by the time judgment and a writ of possession should be awarded to the plaintiff the defendant should be court-martialed or superseded, and a body of United States troops should occupy the fort, of what avail would be the power of the state court and the posse of the country to the plaintiff, in obtaining possession of the premises? Certainly the judgment in an action against a soldier would not bind the United States, or estop them from claiming title in hostility to it." In the case of The Othello [Case No. 10,611], the vessel and cargo were libelled in rem on account of a bottomry-bond, given by her master on the vessel and cargo. The vessel had been chartered by the government. The court say: "The cargo belonged to the United States, and was in their possession as shippers of it. As such it was not subject to seizure or attachment, nor could a suit be instituted against the government in respect to it." In U. S. v. Barney [Id. 14,525], in the United States court of Maryland, in 1810, the defendant was indicted for obstructing the mail, in detaining a horse used in the service of the United States. His defence was, that under the laws of Maryland he had proceeded against the driver for a claim against him, and had taken the horse from him under such law and proceedings. The court, Winchester, J., overruled this defence, saying: "The United States cannot be sued. Suability is incompatible with the idea of sovereign power. The adversary proceedings of a court of jurisdiction can never be admitted against an independent government, or the public stock or property." In the case of The Siren, 7 Wall. [74 U. S.] 152, the vessel had been captured as prize at Charleston. On her way to Boston she ran into and sunk the sloop Harper. She was libelled in Boston, and condemned as lawful prize and sold. In the proceedings the owners of the Harper intervened, asserting her claim for damages occasioned by the collision. The court say at the outset: "It is a familiar doctrine of the common law that the sov-

ereign cannot be sued in his own courts without his consent. The doctrine rests upon reasons of public policy, the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered and the public safety endangered if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition of the means required for the proper administration of the government. The exemption from direct suit is, therefore, without exception. This doctrine of the common law is equally applicable to the supreme authority of the nation, the United States. The same exemption from judicial process extends to the property of the United States, and for 'the same reasons. As justly observed by the learned judge who tried this case, there is no distinction between suits against the government directly and suits against its property." In the same case the court say: "Even where claims are made liens upon property by statute, they cannot be enforced by direct suit, if the property subsequently vest in the government. . . . . So, also, express contract liens upon the property of the United States are incapable of enforcement. A mortgage upon property the title to which had subsequently passed to the United States would be in the same position as a claim against the vessel of the government, incapable of enforcement by legal proceedings." The equity of redemption held by the government, therefore, could not be foreclosed by an advertisement and sale, under a power of sale in the mortgage. In the case of The Davis, 10 Wall. [77 U. S.] 15, the court, announcing the same principles, say: "No suit in rem can be maintained against the property of the United States when it would be necessary to take such property out of the possession of the government by any writ or process of the court." As to what shall constitute such possession, the court say: "The possession of the government can only exist through some of its officers, using that phrase in the sense of any person charged on behalf of the government with the control of the property, coupled with its actual possession." This case cites with approval the case of Briggs v. The Light-Boats, 11 Allen, 157, where these principles are most elaborately discussed. In Case v. Terrell, 11 Wall. [78 U. S.] 199, where the court below had rendered a judgment affecting the interests of the United States in a suit to which it was not a party, the court expressed its amazement that a court of the United States could be found that would render such a judgment, and, with all the impatience that it is proper to attribute to that tribunal, referred to the fact that it had repeatedly held that this could not be done. The state of Virginia has provided by express statute modes of proceeding where individuals have claims

against the commonwealth in certain cases. Chapters 44, 109, 110, Code 1873. See, also, 12 Grat. 564; 5 Leigh, 512. But the courts would no doubt look with amazement upon the lawyer who would attempt to maintain an ejectment for lands in the possession of the commonwealth, under claim of title, especially a record title upon office found.

It may be proper in this connection to notice some principles which, without some discrimination, might appear to be not in perfect harmony with the doctrines we have just shown. It has been held, for example, that the United States in its business relations is subject to the same laws and liabilities as private individuals. Thus, in the case of U. S. v. Wilder [Case No. 16,694], it was held that the property of the United States on board a vessel was liable for salvage the same as the property of a private individual, and because the United States was plaintiff in that suit the lien was enforced. But had the United States been defendant, although the lien attached as though it were the property of a private individual, it was held that it could not be enforced. There was the same right but no judicial remedy. The same distinction was made in the case of The Siren, 7 Wall. [74 U. S. 152], and in the case of Briggs v. The Light-Boats, 11 Allen, 157. So, liabilities in the case of contracts are the same as in the case of individuals, but there was no remedy for their enforcement until congress established the court of claims, in which the citizen is permitted to file his petition. The meaning, then, of the general statement, that in such cases the United States is subject to the same liabilities as private individuals, is, that it is so so far as the right is concerned, but not necessarily so concerning the remedy. When the United States is plaintiff it is liable to be met with the same defences as though it were a private citizen. Again, when the United States is not in the possession of ordinary property, and does not have a record title, liabilities against it may be enforced This distinction was taken in the case of The Davis, 10 Wall. [77 U. S. 15], where cotton which had been captured from the Confederate States, was held liable for salvage, the proceedings to enforce the lien having been instituted and the cotton seized before it came to the possession of the officers of the United States. This principle would not apply, however, where the property is being actually used for governmental purposes. "The lien can only be enforced in the courts in a proceeding which does not need a process against the United States, and which does not require that the property shall be taken out of the possession of the United States." The Davis, 10 Wall. [77 U. S. 15]. See, also, Chit. Prerog. c. 13, § 1. So, also, where the United States, or a state, becomes a stockholder in a private corporation, and even where it creates a corporation, and is the sole owner of the stock, it has been held to surrender or waive its prerogative of

sovereignty in some respects. It could not otherwise transact business; though in the case of [Curran v. State of Arkansas] 15 How. [56 U. S.] 309, where a state was the sole owner of stock in a corporation, the United States court put their decision upon the ground that they were bound to follow the decision of the state court, and that in that case the state had consented to the jurisdiction; and in McCullough v. Maryland [4 Wheat. (17 U. S.) 316], it was held that such stock of the United States was not liable to taxation by the state authorities.

It has also been held that in a suit between individuals the decision is not to ue affected by reason of its ultimate effects upon the rights of the state or nation. Thus in a suit against a collector of taxes for the wrongful collection of the tax, the state may be interested, but it will readily be seen that the state is not directly affected by the result. Judgment is not against the state, nor does process issue against the state or its property, nor does it affect it only by the consent of the state in a subsequent and independent proceeding. These distinctions are clearly explained in Case v. Terrell, 11 Wall. [78 U. S.] 199. In the case of Fowler v. Lindsey, 3 Dall. [3 U. S.] 411, which was an ejectment suit between individuals, growing out of a controversy as to whether the land was in New York or Connecticut, the court refused to regard it as a controversy between two states, because a decision as to the right of the soil between individuals did not decide anything as to the jurisdiction as between the states, neither of the states being nominally or substantially parties to the suit. But surely it must be easy to see that such cases are far different from cases where the direct effect of the judgment and consequent process is to divest the state of its possession and to change its relations to the property. As we have before seen, the direct effect of judgment and execution of final process for the plaintiff in this case would be to turn the United States out of possession and to set aside its title, which could be re-established only in a case where the United States would be plaintiffs. Perhaps the principle we are contending for may seem less surprising when we recall to our minds the familiar doctrine that property in the hands of an officer of the government cannot be attached ([Buchanan v. Alexander] 4 How. [45 U. S.] 20; [Field v. U. S.] 9 Pet. [34 U. S.] 201); nor when in custodia legis (6 Md. 1); and that even a receiver of a court cannot be sued as to property in his hands, as such, without the permission of the court of which he is the officer.

It must be borne in mind that in this case three leading facts occur: 1st. Possession; 2d. record title; and 3d. governmental use. It is possible that in some cases it may be found that suits of this kind may be maintained; but, if so, I think that it will be seen that some one or more of these elements are lacking. It is not necessary for us to argue such a case. It has been contended that property held by the government as private property is held, and without being in actual use for the purposes of the government, may be distinguished from that in actual governmental use. But that is not this case, and it is not necessary to affirm or deny that such distinction exists. We may say, however, that it would not be reasonable or practicable to make such distinctions as to separate portions of property where only one piece is in controversy, especially in a court of law. My attention has been called to the case of French v. Bankhead, reported in 11 Grat. 136, where suit was brought in ejectment against the general in command of Fortress Monroe, to recover lands claimed to be owned by the United States adjacent to that fort. In regard to this it may be said, first, that no question was made as to the jurisdiction of the court, and there was no decision upon the point now before this court. So far as the case shows, it does not appear but that the United States consented to allow the court to pass upon the merits of the case. In the second place, an examination of the case will show further that this question could not have been presented as it is in this case. The United States could not have suggested that it had a record title, for this was the precise question disputed upon the trial. The question was, whether the records produced were to be so construed as to embrace and describe the property in dispute. In this case the decision was in favor of the United States in both the original and appellate courts, and no opportunity occurred to show what might have been the result if final process against the United States had been sought to be enforced.

It was gravely argued, in a memorial presented by this plaintiff to congress for an act authorizing him to have his rights adjudicated by the court of claims (possibly realizing the difficulties of proceeding in any court without the authority of congress), that the United States had no right to acquire the title to this property without the consent of the legislature of Virginia, and this view was earnestly contended for by Senator Johnston in advocating this bill in the United States senate. In regard to this it may be said, first, that it presents a question for adjudication by the court, but to hear it the court must have jurisdiction and the right to determine it. But if we are right in the position we have taken, it is one that cannot be discussed at this stage of the case, nor until it is first determined that the court has the right to question the title of the United States. But we say that such a claim is entirely unfounded. It is true that where the United States becomes the owner of real estate in a state, it does not thereby obtain the power of exclusive legislation over it without the consent of the leg-

islature of the state. The jurisdiction and power of the state still extends over it. But there is a wide distinction between sovereignty and title to real estate; and there is no reason why the latter should not be acquired without the acquisition of the former. This distinction is plainly made by Vattel (book 2, § 83), in reference to states which are in all respects foreign to each other. He says: "What is called the 'high domain,' which is nothing but the domain of the body of the nation, or of the sovereign who represents it, is everywhere considered as inseparable from the sovereignty. The useful domain, or the domain confined to the rights that may belong to an individual in the state, may be separated from the sovereignty, and nothing prevents the possibility of its belonging to a nation in places that are not under her jurisdiction. Thus many sovereigns have fiefs and other possessions in the territories of another prince. In these cases they possess them in the manner of private individuals."

The kingdom of Great Britain and other nations have real estate in the District of Columbia. If, then, a nation may have property in a foreign state, may not the United States have property within her territorial jurisdiction, even though it also be within the territory and jurisdiction of one of the states? But we do not choose to rest upon this theory alone. The United States is not an alien and a foreigner in Virginia. We claim to be citizens of the United States as well as citizens of Virginia. True, there was a time when a considerable portion of the people of the state attempted to repudiate the claims of the United States upon them, and proclaimed that all they desired was to be let alone. True, in later days, a few regarded it as an invasion for the United States to place her soldiers within the borders of our sacred soil. But this idea is now pretty well exploded. We have been reconstructed. The general sentiment is far different. We are all loyal to the United States. We are willing to serve the United States, as no doubt our chief magistrate can abundantly testify. Virginia is not a sovereign state, in the full sense of a sovereign power. It never had the power of declaring war, making treaties, coining money, establishing a navy or post-offices, or laws of naturalization, nor many other powers and prerogatives, universally regarded as pertaining to sovereign nations. Until the Declaration of Independence it was a colony of Great Britain. Its people joined with the people of the other colonies in proclaiming their absolution from allegiance to the British Crown, as "United Colonies." As such they joined in a confederation, and so remained until the adoption of our constitution by the people of the country, under which the United States exists as a nation, supreme within its sphere. As such, it has jurisdiction throughout all the territory occupied by the states, as well as in the territories. It has the usual incidents of a nation. It has the right to acquire both real and personal property for governmental and national purposes. If necessary, it has the right to condemn property for its uses. It could acquire title by confiscation, and declare forfeiture even without office found. 5 Wall. 268. It has the right to take real estate in payment of debts, to sell it upon execution, and purchase it at such sale. This right has been exercised without question from the beginning of its existence. It holds real estate in every city and in every part of the country. It has the right to tax property everywhere within its borders. This right was exercised by the imposition of a direct tax upon the property in question. The taxing power is conceded by all to be far-reaching and all-pervading. It is one of the highest attributes of sovereign power. As is said in McCullough v. Maryland, 4 Wheat. [17 U. S.] 316: "It is an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution, and, like sovereign power of every other description, is trusted to the discretion of those who use it." Under this power the government may declare a forfeiture for non-payment, and may, if it chooses, declare such forfeiture, especially upon inquisition and office found, to result in transferring the title to the government. It was by virtue of a power of such transcendent magnitude that the title to this property appears to have been acquired. Whether this power was executed according to the terms of the law or not, it is not now proposed to discuss. It is sufficient for the present purpose to say that the United States had the right to acquire the title to this property under an act of congress, passed by virtue of its taxing power, and which expressly conferred upon its officers power to purchase real estate for the government for the purposes enumerated by the law, and such right could not be questioned except by attacking the constitutionality of the law itself.

It is refreshing to emerge from the stifling fog and malarial obscurity which beclouds the understanding, dwarfs the spirit of patriotism, and confuses the judgment, when we are seeking for reasons to limit the capacity of our government so as to render it incapable of holding property within its borders for purposes necessary to carry on its operations without the gracious permission of state legislatures, to the serene atmosphere and clear sunlight which inspires such utterances as are found in Kohl v. U. S., 91 U. S. 367. In speaking of the condemnation of real estate under the power of eminent domain, which is said to be the offspring of political necessity, and inseparable from sovereignty, the supreme court say: "This power cannot be enlarged or diminished by a state. Nor can any state prescribe the

manner in which it must be exercised. The consent of a state can never be a condition precedent to its enjoyment. Such consent is needed only, if at all, for the transfer of jurisdiction, and the right of exclusive legislation, after the land shall have been acquired." Why should it be said that the consent of the legislature of a state is required to enable the United States to hold its title to real estate, acquired for its governmental purposes, under the boundless power of taxation, which is also an incident of sovereignty and the offspring of political necessity, any more than when acquired under the power of eminent domain, which is certainly limited by the condition-precedent of giving compensation? But it may be argued that conceding the right of the United States to hold real estate in Virginia without the consent of the legislature, yet as this title has been acquired, if at all, without such consent, therefore it is still subject to the laws and jurisdiction of Virginia; and even though proceedings might not be commenced in the courts of the United States against the United States or its property, yet such proceedings might be instituted in the courts of Virginia, as was done in this case; and although the case has been removed to this court, the rights of the parties are not affected by such removal. The first suggestion in answer to this is, that this is one of those cases which, under the constitution and laws of the United States, both the defendants and the government have the right to have transferred to the courts of the United States. They have the right to have especially all questions relating to the revenue laws of the United States heard and determined by the courts of the United States. When such transfer is made, it is no longer within the jurisdiction of the courts of the state. The subject of the controversy is no doubt subject to the laws of the state, and all questions are to be decided according to the laws of the state as well as of the United States applicable to it. But it is not in the judicial power of the state; it is in the judicial power of the United States, where the parties had the right to place it, and to have it adjudged and determined according to principles applicable to the courts of the United States. But let us consider the case as though it were still in the state court, and as though the state and national jurisdictions were entirely independent of each other. It will not be contended, I presume, that the interests of the United States would be regarded with less consideration than those of a foreign state or nation, and it may be proper to consider a few of the authorities in such cases. In Story, Eq. Pl. § 69, the author says, after stating that where the interests of the crown are involved, or it is sought to divest or affect its rights, the proper mode of redress is not by bill, but by petition of right. "A similar exemption from being sued applies to the case of foreign sovereigns, for they are not suable in the courts of

a foreign country, although they may be found personally within the dominions of such foreign country." In Wadsworth v. Queen of Spain, 17 Q. B. 171 (decided in 1851), the syllabus is: "Property in England belonging to a foreign sovereign prince in his public capacity cannot be seized under process in a suit instituted in this country on a cause of action arising here, and, therefore, where a suit had been brought in the lord mayor's court against the queen of Spain, upon bonds of the Spanish government, bearing interest, payable in London, and moneys belonging to her, as the sovereign of that country, had been attached in the hands of garnishees in London, to compel her appearance, the court of queen's bench granted a prohibition. Although the action was not in form brought against the queen of Spain as sovereign, it appeared sufficiently, by the proceedings, that she was charged with liability in that character. The garnishee, in such case, may move for a prohibition, and it is no objection that he has put in a plea to such attachment." The court, Lord Campbell, C. J., is very severe in his condemnation of such a proceeding. Among other things, he says: "I must express my very great regret that the action should have been brought. I have no hesitation in saying that such actions do not lie, and am very sorry to find that this has been persisted in." This case is well worth examination, as is also the case of Duke of Brunswick v. King of Hanover, 6 Beav. 1, where these principles are elaborately discussed. It will be observed that an attachment is a proceeding in rem; that it may be prosecuted to judgment without the appearance of the owner, and that the action, as stated in the syllabus, was not in form against the sovereign.

To show the extreme regard for the interests of foreign powers in property they may have in this country by the supreme court of the United States, I call special attention to the case of The Exchange, in 7 Cranch [11 U. S.] 117. In that case, a vessel in the possession of the officers of the government of France was libelled by its former owners, who claimed that their title had never been divested. No one appeared on behalf of the French government, but at the instance of our own executive department the attorney-general appeared and suggested that it involved the interests of that government, and the case was heard upon issue made to such suggestion. All the questions relating to the jurisdiction of our courts over the property of foreign powers were carefully reviewed by Chief Justice Marshall, who held most emphatically that they have none whatever, and especially where such property is used for national purposes. This case, too, it will be observed, was decided without the appearance of the French government, and without its appearing from the record that it was a party to the suit. In Harris v. Dennie, 3 Pet. [28 U. S.] 292, an act of congress had

provided that goods imported from a foreign port could not be removed until the owner had obtained a permit from the officer of customs. They were held to be, until that time, in the possession of the United States. Held, that for this reason an attachment by a state officer on behalf of a creditor of the owner of the goods would not lie. The court say: "An attachment of such goods, by a state officer, presupposes a right to take the possession and custody of those goods, and to make such possession and custody exclusive. If the officer attaches upon mesne process, he has the right to hold the possession to answer the exigency of the process. If he attaches upon an execution, he is bound to sell, or may sell, the goods within a limited period, and thus virtually displace the custody of the United States. The act of congress recognizes no such authority, and admits of no such exercise of right." In the case of Briggs v. The Light-Boats, 11 Allen, 177, the state court was asked, under an act of the legislature of that state, to enforce a lien given by the statute to builders of a vessel upon such vessel, after it had been transferred to the use of the United States. The court admitted the existence of the lien, but held that there could be no remedy in the courts. After delivering an opinion of extraordinary elaboration the court say: "In every aspect in which we can look at these suits, in the light of principle or authority, we cannot escape the conclusion that the state courts have no jurisdiction or right to entertain them." In U. S. v. Weise [Case No. 16,659], Grier, J., says: "Even if the state of Pennsylvania had power to tax lands, where the jurisdiction over the lands had not been ceded by the legislature, payment of such tax could not be enforced by distress or seizure of property of the United States. To the extent of the powers granted, the United States are sovereign, and cannot be treated by the states as a mere corporation, a citizen, or a stranger, and subjected to distress or execution for claims, real or pretended, by any county or township officer. If the state of Pennsylvania has any just demand against the government for the use of her soil, recourse may be had to congress, to whom an appeal for justice can always be successfully made, especially when the appellant is a state of the Union. There is no necessity for this humiliating spectacle of petty officers of a state distraining or levying on the public property of the general government, and treating it as a petty corporation or an insolvent or absconding debtor." When the court of the state of Maryland attempted to compel the officer of a branch bank of the United States to use stamped paper in issuing its notes, according to an act of the legislature of that state, the supreme court of the United States said, in McCullough v. Maryland, 4 Wheat. [17 U. S. 316], it should not be done. If these

states in the exercise of their exalted power of taxation for public uses could not affect the operations of the government, or interfere with its property, how much less ought the courts, in behalf of private interests, to place the government in the position so graphically portrayed by Justice Grier.

I now propose to analyze a number of authorities which have been furnished me by counsel for the plaintiff, and to which my attention has otherwise been called as apparently in opposition to the principles for which I have been contending. I shall endeavor to bring out the precise points decided in these, and I invite comparison of my statement of the cases with the reports themselves. But, before entering upon this, permit me again to state the precise principle upon which I rely. It is not (though some of the cases might possibly justify me in so doing) that a suit could not be maintained where simply the interests of the government may be affected. It is not that such suit could not be maintained where the government seizes upon property without color of title, nor where the government claims title without possession or government use, nor where the government is in the use of property, if it could be, without possession or color of title. None of these constitutes our case, and it is unnecessary to maintain such a case, and authorities in such cases can have no controlling effect. Our position is this: That where the United States is in possession of real estate through its officers, and has been in such possession peaceably for a considerable period, under a title of record valid upon its face, the result of what is equivalent to office found, using it in the proper exercise of its sovereign powers, a suit in ejectment cannot be maintained upon process served upon its officers and agents, when the court is properly informed through its proper officer that it claims exemption from suit and expressly objects to the jurisdiction of the court upon this ground. I confidently assert that no authority will meet a case where all these things concur, and that every case which can be cited differs from this in one or more material and vital particulars.

The first and apparently the most formidable case, for it is a leading case, and the basis of most of the others cited, is Osborne v. Bank of U. S., 9 Wheat. [22 U. S.] 856. I propose to bring out this whole case to analyze it as thoroughly as possible, in order to show the precise questions decided and the true principles established thereby. This case is cited in support of a general principle there laid down, that jurisdiction depending upon parties has relation to the actual parties upon the record. Chief Justice Marshall thus states it: "It may, we think, be laid down as a rule, which admits of no exception, that in all cases where jurisdiction depends upon the party, it is the party named in the record. Consequently,

the eleventh amendment, which restrains the jurisdiction granted by the constitution over suits against states, is of necessity limited to those suits in which a state is a party on the record. The amendment has its full effect if the constitution be construed as it would have been construed had the jurisdiction never been extended to suits brought against a state by the citizens of another state or by aliens. The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest or as being only nominal parties. . . . . The parties must certainly have a real interest in the case, since their personal responsibility is acknowledged, and if denied could be demonstrated. . . . . It is believed that no case can be found where any person has been considered as a party who is not made so in the record." As to this, in the first place, I remark that this statement is that of a general principle, and much broader than was necessary to decide the precise case before the court. It has been said, and it is manifest to the judicial mind, that it is unsafe to interpret language used in reference to a particular case before the court as settling general principles as to cases not before the court and of a different nature, and not in the minds of those using the language. See, upon this point, Cohens v. Virginia, 6 Wheat. [19 U. S.] 399, and Peyton v. Bliss [Case No. 11,-055]. So far as the general principle stated is necessarily applicable to the case in reference to which it is used and to like cases, it is authority; but when cases of different nature are in contemplation, it is obiter dicta to the extent of the difference between the cases.

Now let us see what was the precise case before the court and the precise point decided; the legislature of Ohio, representing a strong public opposition to the United States Bank, passed an act directing that if, after the 15th day of September, 1819, it continued to transact business in the state it should be liable to a tax of $50,000 on each office of discount and deposit, and in such case directed the auditor to make out a warrant, directed to any person, authorizing him to enter the banking-house and seize the money if not paid, and if necessary to go into every room, open every chest, etc. On the 14th of September a bill was filed for an injunction against the auditor. The auditor was served with subpoena and indorsement of bond for injunction early on the 15th of September. After that, to wit, on the 17th of September, one Harper, who had been employed to collect the tax, entered the bank and violently seized $100,000. While taking this to the capitol, he was served with the injunction. He took it, however, to the state treasurer and delivered it to him. It passed to his successor in office, who, though he passed it upon the books to the credit of the state as revenue, kept it in a separate package. The bill was filed against the auditor and was afterward amended by making Harper and the treasurer parties defendants. A decree was made directing them to restore the money, and they appealed to the supreme court of the United States. The principal points made were that the bank could not sue in the United States court; that it was a case for a court of law and not for a court of equity; that the law of Ohio was constitutional and justified the act; and that, as it was a suit against the officers of a state, having a direct effect upon the property of the state, such suit was prohibited by the eleventh constitutional amendment. It will thus be seen that this was in reality a contest between two sovereign powers, the state of Ohio and the United States, initiated by the state of Ohio, having for its object the destruction of one of the instrumentalities of the sovereign power of the United States, and invoking the principle of immunity from suit for the very purpose of being permitted to commit the injury against sovereign power which this immunity from suit is designed to prevent. The point under discussion, when the statement of the above general principle was made, was the interpretation of the eleventh constitutional amendment, which declares that the judicial power shall not be construed to extend to suits against a state by citizens of another state or alien. The court say the interpretation is to be made by considering the words. English cases will throw but little light upon it. This amendment is but a limitation upon the judicial power originally granted by the constitution. It is therefore necessary to determine what was originally granted. Illustrations are then given to show that the original grant of judicial power was to enable the court to take jurisdiction over states where they were made parties upon the record, and, as decided by the supreme court before this limitation was made, where they were parties defendants upon the record. The amendment limits this judicial power only by denying it in cases where suits are against a state by citizens of other states and aliens. The original grant of power enlarged the jurisdiction of courts only to the extent of allowing states to be made parties defendants upon the record. Where states were interested but not named in the record, then jurisdiction would depend upon principles of common law. As this was the interpretation of the original grant of judicial power, and the eleventh amendment was simply a limitation of the original grant, both had reference to states when named as parties upon the record. The court say, therefore, that the eleventh amendment was not a prohibition to the

suit. The question of jurisdiction depended upon principles aside from this, and in cases embraced by the limitation stood just as it would without either the original grant or the eleventh amendment. As the court say, "the amendment has its full effect if the constitution be construed as it would have been construed had the jurisdiction never been extended to suits brought against a state by the citizens of another state or aliens."

Now, the general statement we have been considering was made for the purpose simply of interpreting the eleventh amendment, a subject with which we have nothing to do, and it was made, too, with particular reference to the case then before the court. So far as the interpretation goes, it is simple, direct, and plain, and is binding authority, but the general statement made in illustration merely, or arguendo, is not necessarily so, especially in cases of an entirely different nature. The court did not mean to say that the courts would always take jurisdiction in cases where the interests of states or sovereign power are affected unless such state or sovereign power were a party on the record. If it did, it was unnecessary to say so for the purposes of that case, and can easily be shown to be incorrect. For example, in the case of The Exchange, 7 Cranch [11 U. S. 116], decided by Chief Justice Marshall himself, it was held that the court could not take jurisdiction, because it affected the rights of the French government, when, certainly, that government did not appear as a party to the record. An act of congress provides that the assignee of a chose in action shall not be able to sue in a United States court as a citizen of another state if the assignor could not. If such assignee, then, commences suit, it can then be shown that the court has no jurisdiction, because it has no jurisdiction over one not a party to the record. Many illustrations might be given to show that the statement cannot be correct as a universal principle applicable to every variety of cases. The English cases already cited do certainly show that it is not, as applied to an ejectment case. So the cases of The Siren and The Davis [supra] show that the rule would not apply in admiralty. It must be evident that language of a judicial opinion cannot be construed by the same rules as that of a statute. Rules as to parties are different in different forms of action. They are unlike in cases at law and in equity, in admiralty and in ejectment. Proceedings in rem are different in this respect from mere personal actions. Jurisdiction may be obtained over property when it cannot over its owner, and so it may over persons when it cannot over the property to be affected. For example, a court of equity can take jurisdiction of a case affecting property beyond its jurisdiction where process can be served upon the proper persons. Penn v. Lord Baltimore, 2 White & T. Lead. Cas. Eq. 1806. Now it would be very difficult to lay down a principle as to parties applicable to all such cases. Because a rule might be applicable in one, it would be unsafe to hold that therefore it is applicable to all. Take the instance of a case in equity where a necessary party is beyond the jurisdiction of the court, and for that reason process cannot be served. It is true that in most states proceedings in rem may usually be prosecuted by publication in such cases; but it has not always been so. In such cases the court say, in Hagan v. Walker, 14 How. [55 U. S.] 36, "Where no relief can be given without taking an account between an absent party and one before the court, though the defect of parties may not defeat the jurisdiction, strictly speaking, yet the court will make no decree in favor of the complainant." The court will refuse to proceed in all cases, and refuse to make a decree affecting his rights, if there is a party necessary over whom, for any reason, jurisdiction cannot be obtained. See [Barney v. Baltimore] 6 Wall. [73 U. S.] 280; [Russell v. Clark] 7 Cranch [11 U. S.] 98; [Shields v. Barrow] 17 How. [58 U. S.] 136.

In the case at bar the court cannot obtain jurisdiction over the United States, and yet judgment, according to the statute, cannot be obtained and enforced without defeating the title of the United States, and putting them out of possession. In 6 Wall. 187, the court say, "The rule is universal that if the power be conferred to render the judgment or enter the decree, it also includes the power to issue proper process to enforce such judgment or decree." It follows as a logical and absolutely necessary deduction from this, that, if it be ascertained that the court has not power to issue proper process for the enforcement of its judgment or decree, it has not power to enter them. Now, the reason that a decree was made and sustained in the case of Osborne v. Bank of U. S. [supra] appears, partially, in the language of the general statement we have been considering; and that is, that the court had jurisdiction over persons who had such relations to the property in controversy that a decree against them could be enforced which would effectuate the whole object of the suit. They had possession and control of the property in controversy. This will be more apparent from a more critical examination of the case. At the time of the commencement of the suit the property was in the possession of the bank. The defendant obtained it in violation of the injunction, but even then it never came to the full possession of the state of Ohio. The court had power to grant full relief by enforcing its process against the parties named in the record. It admits that if the property was in full possession of the state of Ohio the suit could not be maintained. The foundation of the bill was that the property had not gone into the

possession of the state of Ohio. It was upon this ground that the suit was maintained as one suitable for a court of equity instead of a case at law, and the injunction was granted for the purpose of preventing the defendant from delivering the property to the state of Ohio, whereby the remedy would be lost. It will thus be seen that the whole foundation of the case, the vital point and object of the bill, was to prevent a change of possession, to prevent the state of Ohio from obtaining possession. It was because this would have placed the state in such a situation that suit could not have been maintained that this suit in equity was sustained. The bill recognized and rested upon the very principle we are contending for, to wit, that the possession of sovereign power cannot be disturbed by judicial process. Without this principle the case itself would have been totally destitute of vitality. The bill alleges "that neither Currie nor Sullivan held the said money in their character as treasurer, but as individuals." The case, when properly understood, is a most complete vindication of our position. The "true inwardness" of this case is, that while a suit could not have been maintained if the property had come into the possession of the state, yet it could be maintained to prevent it from coming into such possession, and the state could not, by merely asserting its interest in the subject in controversy, and without being a party to the record, defeat the suit. The court say: "Where the right is in the plaintiff, and the possession is in the defendant, the inquiry cannot be stopped by the mere assertion of title in the sovereign." The court say this because in that case the possession was in the defendants and not in the state. It says further: "In such case a friend of the sovereign may suggest it, but the court will go on and investigate the title if it has jurisdiction of the parties before it who have possession of the property." In the case at bar the defendants in the suit have not possession. The United States is in the actual possession, according to the definition of possession given by the court in the case of The Davis, 10 Wall. [77 U. S. 15], as follows: "The possession of the government can only exist through some of its officers, using that phrase in the sense of any person charged on behalf of the government with the control of the property coupled with its actual possession," and in reference to which the court say, in the same case, the proceeding could be maintained only when it "does not need a process against the United States, and which does not require that the property shall be taken out of the possession of the United States." Let it be borne in mind, too, that it is not title that we suggest, at least nothing more than a prima facie record-title. It is not a suggestion of ownership that we make or rely upon. We would not ask the court to try title or ownership on suggestion. We simply suggest facts, which are indisputable,—possession, record, and government

use. We are not contending that a mere suggestion of interest in the property, or title thereto, without possession, record, or government use, would deprive the court of power to hear the cause. If the facts we suggest are disputed, then the court will investigate the cause sufficiently to determine their truth or falsehood. If found to be true, that is all we now claim; if false, of course we fail, and the court will proceed. Aside from these general expressions used "arguendo," this case of Osborne v. Bank of U. S. is, in another point of view, one of the strongest cases that can be found in support of the positions we have taken. In the first place, in speaking of the point as presented by the state of Ohio, in a case, as we have already seen, quite different from this, the chief justice says: "The full pressure of this argument is felt, and the difficulties it presents are acknowledged. . . . . The very difficult question is to be decided whether in such a case the court may act upon the agents employed by the state and on the property in their hands." Before passing to its discussion he deems it proper to pause and reflect upon the consequences of denying this power to a court of the United States, and he then goes on to show how the result would be to permit an attack upon the very sovereign power we are now endeavoring to maintain. Now, in that case, the great question to be decided, that which overshadowed all others, they being mere questions of jurisdiction, form of action, authority to sue, etc., was the constitutionality of the legislative act of Ohio, the object of which was to impair and destroy, so far as it could, one of the means and instrumentalities of the government of the United States. The state of Ohio had made an attack upon the sovereign power of the United States through its most formidable weapon, the sovereign power of taxation upon property within its jurisdiction. It was not an attack by a private citizen through a proceeding in a state court; it was the state of Ohio itself, speaking and acting by the whole force of its legislative and executive power, inspired by the most determined resolve to so impair the operations of one of the instrumentalities of the United States as to render it incapable of action there. Could this be permitted, was the great question in that case. Upon this question the great chief justice, aided by the discussions of Clay and Webster, brought the full force of his intellect, and the result was a complete vindication of the precise principle for which we are contending,—the entire independence of the means and instrumentalities of the United States government from all interference short of the sovereign power of the government itself. The independence of such instruments from all interference has been carried to such an extent that the supreme court has held that a state cannot tax the income of an officer of the United States (Dobbins v. Commissioners, 16 Pet. [41 U. S.] 435), nor can the

United States tax the income of a state officer (Collector v. Day, 11 Wall. [78 U. S. 113]).

The principle which we would present prominently, which, as we have seen, is not only in harmony with the case of Osborne v. Bank of U. S., but is the leading idea upon which the bill in that case was framed, and which will be found to be the test which may be applied to nearly all of the cases cited by the plaintiff, showing them not to be in conflict with our position, is this: Wherever the process necessarily growing out of the proceedings has the effect to take the possession of property from the sovereign power, to divest it of such possession and change it to an individual, without the consent of such sovereign power, express or implied, or where the suit has not been instituted by the sovereign, the suit by an individual will not be maintained. In nearly all the cases the reason given has reference to this principle. The process of a court is its effective means of action. The proceedings in an ejectment suit do no harm to any one except by the final process, the writ of possession. In some suits process to take possession may issue at the commencement of the suit or during its progress; but it makes no difference in principle at what time such process issues. A process to take possession gives authority to the officer to use sufficient force to execute it. It authorizes the officer to put down such force as may be opposed to it. Now, if this process can be executed upon parties to the cause, and full effect given to it by the execution upon such parties, then it may be done; but if, in order to execute it, it becomes opposed to a sovereign power not a party to the cause, such sovereign power, not being a party, is not bound by the order of the court, and has the legal right to resist. It cannot be that an officer has the legal right to take possession from a sovereign and at the same time that the sovereign has the lawful right to resist. This would produce a collision like an immovable body being met by an irresistible force. It surely will not be pretended that the sovereign, if not a party, would be bound legally or morally to yield its claims on account of a judgment in a case in which it had not been heard. See 27 Grat. 301. However this may be, the principle above stated will be found to be the key to reconcile what otherwise might appear to be conflicting. Thus in the case cited from 8 Mees. & W. 579, the court say: "The question may be tested thus: Suppose there were no trial, but judgment went against the casual ejector, then there would be a writ to turn the crown out of possession, which clearly cannot be." In Osborne v. Bank of U. S., the writ had full effect by its operation upon the individuals named as defendants upon the record. It could not invite resistance by state authority, nor could it have been resisted by the

state except upon its own motion, and not merely in opposition to the process. The reason of this principle is well stated in People v. Ambrecht, 11 Abb. Pr. 97: "In practice it migh prove mischievous by bringing the state and national sovereignty in conflict. The state, by its militia, would be bound to execute the process of its courts and give possession in pursuance of ejectment, while the United States might be disposed to retain possession of its fortifications and barracks by a resort to force if necessary. . . . . Certainly the judgment in an action against a soldier would not bind the United States or estop them from claiming in hostility to it." This was the precise principle applied in Harris v. Dennie, 3 Pet. [28 U. S. 292], and Briggs v. The Life-Boats, 11 Allen, 157, and it is the reason why an attachment would not lie in a state court against goods in the custody of a United States marshal.

Let us now apply this test to some of the other cases cited by the plaintiff. In the case of Davis v. Gray, 16 Wall. [83 U. S.] 203, the receiver of a railroad company filed a bill in chancery to enjoin the governor and land commissioners of the state of Texas from issuing patents of lands claimed to belong to the company to other persons. Those lands had been granted to the company upon certain conditions, which it was claimed by the defendants had not been performed, and for which reasons that the lands had become forfeited. It was objected that this was equivalent to a suit against the state, though not a party to the record. The main question upon the merits was as to whether the obligation of contracts had become impaired by this action of the state officers. The court decided the case upon two grounds: one that the state of Texas allowed suits of this kind in its own courts, citing a number of cases; and the other is stated as follows, to wit: "Here the property in question is not in possession of the defendants. The possession of the receiver has not been invaded. He has not been in possession, is not seeking possession, and there is no question in the case relating to that subject. . . . . He is seeking to enjoin the appellants from doing illegal acts, which, if done, would render the right and title of the property in his hands of greatly diminished value." The court could enjoin the governor as well as any other and inferior officer from doing an illegal and unconstitutional act. In the case of U. S. v. Peters, 5 Cranch [9 U. S.] 115, proceedings had been had in admiralty against certain certificates held by one Rittenhouse, who was treasurer of the state, and which were claimed to be proceeds of a vessel belonging to the state of Pennsylvania. It was claimed by the state authorities that as the state was not a party to those proceedings the court had no jurisdiction to decree against it, and that it was not, therefore,

bound by the decree of the court, and the legislature of the state passed an act declaring such decree to be void as against the state, and directing the governor to employ sufficient force to resist its execution. The district judge, Peters, submitted the question to the supreme court on a return to a writ of mandamus ordering him to show cause why he should not issue the writ notwithstanding the act of the legislature. It was decided by Marshall, Chief Justice, that the court had jurisdiction notwithstanding the interest and claim of ownership suggested by the state. He says: "In this case the suit was not instituted against the state or its treasurer, but against the executrices of David Rittenhouse for the proceeds of a vessel condemned in the court of admiralty which were admitted to be in their possession." After giving a history of the case, the court further say: "These circumstances demonstrate beyond the possibility of doubt that the property which is represented in the Active and her cargo was in possession not of the state of Pennsylvania but of David Rittenhouse as an individual, after whose death it passed, like other property, to his representatives. Since, then, the state of Pennsylvania had neither possession of nor right to the property on which the sentence of the district court was pronounced, and since the suit was neither commenced nor prosecuted against that state, there remains no pretext for the allegation that the case is within that amendment of the constitution which has been cited, and consequently that the state of Pennsylvania can possess no constitutional right to resist the legal process which may be directed in this cause." In Olmsted's Case, Brightly, N. P. 9, the marshal was attached for not obeying the process of the court directing him to pay over the moneys described in the above case of Judge Peters, where the same principles were declared, and the decision was based upon precisely the same grounds, to wit, that the state was not in possession, but was in the possession of Rittenhouse as an individual while the suit was being prosecuted. In the case of Swasey v. Northern Cent. R. Co., 71 N. C. 571 [Case No. 13,679], the state was not in possession of the property, but in possession of the railroad company. The court say: "The railroad company, therefore, in this case holds the share of its property represented by the stock subscribed by the state in trust as well for the stockholders as for the state. The charter made the company the depository of the pledge to hold it for both parties according to their respective interests." This case, was, however, decided substantially upon another ground, which I will presently show. The United States was not in possession in the case of Elliott v. Van Voorst [Case No. 4,390], nor did the question of possession arise in the case of McCoy v. Washington Co. [Id. 8,731]. I think it may safely be said that in no case where this point has been decided has the court held that proceedings can be maintained in a suit against the sovereign where the necessary process is to divest such sovereign "in invitum" of the possession of the property in controversy. I think also that this principle is in harmony with all the cases which have been or can be cited. But a class of cases have been cited which, as we shall see, were decided upon another principle, not at all in conflict with the position we have assumed, to wit, consent of the sovereign.

In the case of Swasey v. Northern Cent. R. Co. before alluded to, the facts were as follows: The railroad company had been incorporated by the state, and the board of improvement had been authorized to subscribe $2,000,000 capital stock. In case it became necessary to borrow money, the state was authorized to issue certificates in sums of not less than $1000 each, pledging the payment in thirty years, with interest at 6 per cent. As security the faith of the state was pledged, and in addition its stock held by the company was pledged for the same purpose, and dividends upon stock were to be applied to the payment of interest. This stock was made preferred stock. Subscription was made and certificates issued. A large amount of interest had accrued upon these certificates. An action was brought in chancery by the holder of seven of these certificates, in his own behalf and in behalf of others who chose to join with him, asking that a sufficient amount of state stock be sold to pay this interest. The objection was that the court did not have jurisdiction because it was against the property of the state.

After citing Osborne v. Bank of U. S. in support of the position that a suit may be maintained where the state is not made a party upon the record, the court decides this point in the following words: "The real question, therefore, presented for our determination is whether the court has jurisdiction of the property which it is sought to charge or of the agent having it in possession. The property consists of shares in the capital stock of a corporation. At its inception it became charged as security for the payment of the debt contracted on its account. This was part of the law of its creation. It has always been pledged. The property of a corporation represents its stock. This property the corporation holds for its stockholders. A stockholder's share of the stock is equal to his share of the corporate property. The railroad company, therefore, in this case holds the share of its property represented by the stock subscribed by the state in trust as well for the stockholders as for the state. The charter made the company the depository of the pledge to hold it for both parties according to their respective interests; consequently a suit which seeks to charge the stock as

security and brings in the corporation to represent it may be maintained in the absence of the state as a party. This was evidently the understanding when the pledge was made. It was then the case as now that a state could not be sued, but that its agents could, and that property in the hands of its agents could be controlled and disposed of by the courts in proper cases notwithstanding the ownership by the state. The faith of the state had been pledged. This pledge the courts could not enforce. The stock to be obtained with the money borrowed could not be reached under such a pledge of faith alone, because a suit could not be prosecuted for that purpose. Notwithstanding this a lien was given upon the stock as security in addition to the pledge of faith. But it was no addition if the bondholder had no power to make his security available. A lien which cannot be enforced has no value as a security. These parties were engaged in no such vain work. It was clearly their understanding that the state not only should but that it in fact did grant to the bondholders the power to use the machinery of the courts to subject this portion of their security if default should be made in the payment of the debt. In sustaining this action, then, we are but carrying into effect the manifest intention of the parties at the time the money was borrowed." Is it not perfectly manifest that the two leading ideas of this decision are, 1st, that the property in controversy is in the possession of the company in trust as a depository, and that therefore the power of the court can have full effect by operating upon the parties named; and, 2d, that the state, for the purpose of the enforcement of the trust, had consented to grant "the full power to use the machinery of the courts?" Were this not so the court say the giving a power to sell the stock to meet its liabilities, "in addition" to the faith of the state, which could not be enforced by suit, would have been a vain thing. It has been held that a state, by becoming a member of a corporation, or by chartering a bank to be carried on in the usual course of banking business, thereby surrenders its prerogative of exemption from suit against such corporation or bank. Such act or charter is construed as a consent that its obligations incurred through such means may be enforced by the courts. This is indeed a necessity, for otherwise it could not do business in such capacity. Individuals would not deal with a party whose obligations could not be enforced. This was the ground of the decision in Briscoe v. Bank of Kentucky, 11 Pet. [36 U. S.] 257. In that case the bank, which had been incorporated by the state and made liable to be sued, brought suit upon a note given to it. The defence was that the consideration was bills of the bank, which it was claimed, being issued by such bank, of which the state was sole incorporator, were bills of credit issued by the state, and were therefore unconstitutional and void, for which reason there was no consideration. The question then was whether they were bills of credit in the sense contemplated by the constitution. Bills of credit in that sense were defined to be bills issuing solely on the faith of the state. Such bills could not be enforced, for there could be no suit against the state. In issuing such bills it was not to be presumed that the state intended to do an unconstitutional act. Such construction was not to be given to the act unless necessary. As it had been held, citing Bank of U. S. v. Planters' Bank, 9 Wheat. [22 U. S.] 904, that when a government becomes a corporator it lays down its sovereignty so far as it respects such corporation; that therefore the bank could be sued and payment of its bills thus enforced, on account of which the bills did not rest solely upon the faith of the state; they were not bills of credit in the sense contemplated by the constitution.

Justice Story, in dissenting from the opinion of the court, thought that as the state, being the sole owner of the securities of the bank, might at its pleasure by legislative act withdraw such securities, and thus leave nothing to rely upon but the faith of the state, the effect was that the bills had nothing but the faith of the state for her security, and therefore were bills of credit in an unconstitutional sense. But this precise question came up afterwards in Curran v. Arkansas, 15 Pet. [40 U. S.] 304, where it was held that such action by the legislature would itself in such case be unconstitutional, as impairing the obligation of contracts. The leading idea of these cases is that the privilege of exemption from suit is in such cases waived and the jurisdiction rests upon consent. The case of U. S. v. Bank of Metropolis, 15 Pet. [40 U. S.] 377, was where a suit was brought by the United States as plaintiff, and the defendant claimed off-set to an amount in excess of the claim. The principle announced is, "When the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibilities of individuals who are parties to such instruments. We know of no difference except that the United States cannot be sued." In this case off-sets were allowed and a judgment sustained against the United States for over $3000. But in later cases this has been refused. In Reeside v. Walker, 11 How. [52 U. S.] 290, the court say: "To permit a demand in set-off against the government to be proceeded on to judgment against it would be equivalent to the permission of a suit to be prosecuted against it." This cannot be tolerated "as against the government, except by a mere evasion, and must be as useless, in the end, as it would be derogatory to judicial fairness." . . . The court also say, it being the settled principle of our government that the sovereignty of the government

protects it from suit even against judgments for costs, "it would be derogatory, to the courts to allow the principle to be evaded or circumvented." In U. S. v. Eckford, 6 Wall. [73 U. S.] 490, the above extracts are quoted and affirmed, by which it seems very plain that in this respect the case of U. S. v. Bank of Metropolis [supra] is overruled.

Two or three cases have been cited, apparently for the purpose of showing that whatever may be the law of England upon this subject, or whatever may be the law where a sovereign's rights are to be passed upon by its own courts, in relation to property within its exclusive territorial jurisdiction, yet, that as to property of the United States within a territorial jurisdiction of a state obtained without the consent of the legislature, this prerogative of exemption from suit is not to be applied. As to this, it is, it seems, apparent that the cases already cited by us as to the application of this prerogative in relation to states entirely foreign to each other are sufficient to establish the position that such a doctrine cannot be maintained. But even these cases I think do not so hold. Certain expressions used arguendo disconnected from the case in hand may convey such an idea, but the decision, taken as a whole, does not warrant the principle contended for, especially in such a case as this. In Com. v. Young, Brightly, N. P. 302, the defendant was indicted for selling land so held, as an auctioneer, in violation of a law of Pennsylvania, which prescribed that sales of land at public auction should be made only by a person commissioned by the governor. It was contended that the defendant was justified by having acted under the direction of the president of the United States, and that the law did not apply to land held by the United States, as it was not expressly named in the statute. But the court held that lands so held were in all respects subject to the laws and municipal regulations of the state. That in such cases the United States held land as an individual, and not as a sovereign. That the state is the sovereign over the land. That although the United States held the fee, yet sovereignty and title are separable from each other. That the United States held by the same tenure as an individual, and that the principle of law that a sovereign is not bound by a statute unless it is expressly named is inapplicable in such a case. This is, I think, a fair statement of the views of the court in that case. It will be observed that much more is said than was necessary to decide the point then before the court, but I can see no inconsistency with the statement as made with the position assumed by us. There is no doubt but that lands so held are to be governed in all respects by the laws of the state as a general principle when such laws do not trench upon some proper and necessary prerogative of the sovereign power of the United States. In this case there was no attempt to disturb the possession of the United States, to impeach its title, to interfere with the means and instrumentalities of the United States in the exercise of its sovereign powers, or even to affect the interests of the United States in any respects whatever. An individual who was indicted for an offence against a statute law of the state attempted to bring to his aid the sovereign prerogatives of the United States for his own purposes, and this the court said he could not do. And that was really the whole of this case.

The case of Elliott v. Van Voorst [Case No. 4,390] was as follows: The United States, upon a judgment against Swartwout, a defaulter, and sale upon execution, had bid in an equity of redemption upon land previously mortgaged. Afterwards suit was brought to foreclose the mortgage. The United States was made a party, and the district attorney of the United States appeared and filed an answer, and submitted the interests of the United States to the court. Van Voorst became the purchaser at the foreclosure sale. After twenty years (during which the land had been built upon and immensely increased in value), Elliott, who, somehow, had procured an assignment from the United States, instituted another suit to recover, claiming that the equity of redemption had not been properly foreclosed. The court decided that, under the circumstances, this could not be done, especially in a collateral proceeding— a decision not at all in conflict with our position. But the court says: "In the mere exercise of a mere corporate right, the United States cannot claim the immunities or prerogatives of a sovereign. She cannot compel a mortgagee to the hopeless remedy of a petition to congress and redeem. . . . When the government, in the exercise of the rights and functions of a civil corporation, purchases land to secure a debt, the accident of its sovereignty in other functions cannot be set up to destroy or affect the rights of persons claiming a title or lien on the same lands." In the syllabus it says: "When it purchases land within a state not intended for forts, arsenals, and other national uses, but merely to secure a debt, it takes the land as any corporation, and cannot claim any of the immunities and prerogatives of a sovereign." But it also says: "The rights of the United States government as a sovereign, and its prerogatives as such, are coextensive with the functions of government committed to it." The whole case shows, by the strongest implication, at least, that, in relation to property, used for public purposes, the prerogatives of sovereignty are to be applied in full force even where the land is obtained without the consent of the legislature. In 3 Story, Comm. Const. § 1671, the author says: "Cases may, indeed, occur in which the individual may

not always have an adequate redress without some legislation by congress. As, for example, in places ceded to the United States and over which they have exclusive jurisdiction, if his real estate is taken without or against lawful authority. Here he must rely upon the justice of congress or of the executive department." In section 1672, he says this has sometimes been regarded as a serious defect. But if it is so, it is a defect of the constitution itself. After suggesting the propriety of some legislation upon the subject, and commenting upon the petition of right as it exists in England, he says: "The republic enjoys a despotic sovereignty to act or refuse as it may please, and is placed beyond the reach of the law." In the first extract the writer states positively that the property of the United States is exempt from suit in a case like the present, certainly in places within its exclusive jurisdiction. But it may be that in his manner of statement it may be otherwise implied, in places not within its exclusive jurisdiction. The statement undoubtedly does imply that he was not so certain in the latter case as the former. But that is all. It is a mere negative implication. He by no means intends to say that the same principle would not apply in the latter case. He is not professing to enumerate all the cases in which the principle is applicable. The main thought in his mind is the apparent hardship which sometimes results from this prerogative of the government, and gives as an illustration merely an example about which, in his view at least, there is or can be no question. It certainly would not be treating the author fairly to say that he gives it as his deliberate opinion that in cases not within the exclusive jurisdiction of the United States the rule would not apply, especially in a case like the present, where the property is being used as this is for public purposes. There is nothing to show that as to this part of the extract he gave it more than a passing thought. In U. S. v. Fox (Sup. Ct.) 94 U. S. 315, land in New York had been devised to the United States for the payment of the public debt. The law of New York did not permit such a devise. The United States applied for probate of the will, and it was resisted by the heirs. It was held that lands in New York could not be devised contrary to the law of that state, even though the devisee were the United States. The state has exclusive power to regulate the tenure of lands within its jurisdiction. This follows from her sovereignty. Title and modes of disposition of real property are not matters placed under the control of federal authority. Such questions are to be determined by the laws of the state.

It is impossible for me to see anything in this bearing upon the question of the right of the United States to exercise its prerogative of exemption from suit as to property in a state in public use. It is nothing more than the statement of a general principle which all admit, that real estate within a state is subject to the laws and jurisdiction of the state. This is no doubt always so, except when any action in relation to it trenches upon the prerogatives of the United States. This case asserts in the strongest manner the right and prerogative of the United States to acquire property for public use in any state, even, if necessary, in hostility to the express enactments of the legislature. It will be observed that in none of these cases cited upon this point was the property in controversy public property; that is, in public use as one of the means of carrying on the government. I am sure that none of them show that the United States is deprived of any of its sovereign powers or prerogatives in relation to any property held by it which it has the right to acquire for its own public uses within its territory, no matter where it may be, nor that they hold them by the permission of state legislatures. It will not be pretended that the United States can be sued directly in relation to such property. But why not, if they can be sued indirectly? If it be pretended that the prerogatives of the United States do not extend as to property held under the exclusive jurisdiction of a state, why not bring a direct suit against it at once? The principle stated in the syllabus of the case of Elliott v. Van Voorst [supra] seems much more consistent: "The rights of the United States government as a sovereign, and its prerogatives as such, are coextensive with the functions of government committed to it." [Worcester v. State of Georgia] 6 Pet. [31 U. S.] 570. Perhaps a state might provide by law that the United States should not acquire title to real estate within its borders for private purposes, except through the exercise of some sovereign power of the United States, such as taxation, eminent domain, etc., and in such cases it might limit the rights of the United States. But when the United States proceeds or acts as a sovereign, where it has the right to go and to act in spite of the legislature, it goes and acts as a sovereign, with all the prerogatives of a sovereign. Otherwise, it is not a sovereign power at all, but a mere subject or foreigner.

The cases we have heretofore cited show how a sovereign power, entirely foreign, is to be regarded; and certainly to show that the United States is to be treated with less consideration, the authority and the logic should be irresistibly clear, especially in view of the decisions of the supreme court in the cases of The Siren and The Davis. The burden of the argument is certainly upon those who would establish such a distinction. Prerogatives are, by the common sense of mankind, attributed to sovereign power for the sake of the public good and for the reason that they are considered prop-

er and essential for the exercise of its functions. They enter into the very definition of sovereign power. As such, they pertain to all nations. There is the same reason for their belonging to the United States as to any other sovereign nation, and if the United States is a nation at all, it is, I contend, disrespectful to it to suggest that it is inferior in these respects to any other nation. So far as it has occasion and the right for the exercise of sovereign power, so far should it have the same privileges and prerogatives as are accorded to all other governments. I protest against the idea that it holds them in the exercise of its sovereign powers in subjection to any power whatever. It cannot be denied that in England ejectment for the recovery of lands in the possession of the crown cannot be maintained. But it has been suggested that a reason exists there for this that does not exist here, in that there is a remedy by petition of right, and that, therefore, it is there a mere question as to proper form of proceeding. But that is not true in fact. We have the same remedy in substance as petition of right; that is, by petition to our sovereign or its representative, the congress. Not as simple and effective in practice, I admit, but in theory the same. In law, the supposition cannot be indulged in that our sovereign will not do justice as speedily and promptly as any other sovereign. But if in practice this mode of proceeding is found to be unsatisfactory, that is a question which addresses itself to the discretion of congress and not to the courts. Strong arguments may be used, as were used by Story in his Commentaries, for action upon this subject by congress; but such arguments are for that body and not for this tribunal. Meanwhile, precisely the same reason for not permitting an ejectment suit for the recovery of lands in possession of the crown exists for not permitting such a suit for lands in the possession of the United States, especially when in government use.

A class of cases have been cited to show that courts have taken jurisdiction in cases of this kind, and have in such cases passed upon the validity of the title. I propose to examine those to which my attention has been called, seriatim, and in each one, though varying from each other, we will find important differences from the case at bar. The first one is Meigs v. McClung, 9 Cranch [13 U. S.] 11. The question there was as to the construction of a treaty, whether the land in controversy was described as within the reservation of the terms of the treaty. The court say: "The question on which the cause has been placed is this, is the land claimed by the plaintiff in the court below within the ceded territory?" The court further say: "The fact that the agents of the United States took possession of the lands lying above the mouth of the Highwassee, erected extensive improvements thereon, and placed a garrison there, cannot be admitted to give an explanation to the treaty which would contradict its plain words and obvious meaning." It will thus be seen that the question of jurisdiction was not made, was not brought to the attention of the court, and certainly was not passed upon by the court. The court expressly say what the question was upon which the cause had been placed. That case differed, too, from this in another very important aspect. There a record-title could not have been suggested, as there is in this case. The United States had no claim of title except by contradicting the record produced. It did not come at all within the case we have before cited from 4 Coke, 55a, known as Sadler's Case, where the court said: "At common law, when the king was seized of any estate of inheritance or freehold by any matter of record, were his title by matter of record judicial as attainder, ministerial as by office, or by conveyance of record as by fine-deed enrolled, etc., or by matter of fact, and found by office of record, on oath, as by alienation, purchase by alien, etc., he who had right was put to his petition of right, in nature of a real action, to be restored to his freehold and inheritance." This case was one of the most prominent of leading English cases. It is cited in hundreds of English cases. It is referred to as the law in the textbooks, and is unquestioned by any authorities of our own courts. See 5 Bac. Abr. tit. "Prerogative"; The Bankers, 14 Howell, State Tr. 28; Chisholm v. State of Georgia, 2 Dall. 419. We rely upon this principle as the settled law of England, beyond all question. See Attorney-General v. Hallett, 15 Mees. & W. 106. And we can conceive of no reason why it should not be so regarded here.

The next case is that of Wilcox v. Jackson, 13 Pet. [38 U. S.] 498. There suit was brought to recover Fort Dearborn, in Chicago, against the officer in command. The decision was in favor of the plaintiff in the state court, but upon a writ of error it was reversed by the supreme court. It is true that it was not reversed upon the ground of want of jurisdiction, but upon other errors assigned. The court does not pass upon the question of jurisdiction, nor mention it as a question made in the case. It is assumed, however, that by passing upon the law of the case it decided the question of jurisdiction. It will be observed that the question of jurisdiction raised by us is not strictly as to the subject-matter. It is a question arising from the character of the party, and is undoubtedly one which may be waived by consent. Perhaps that consent may be implied where the point is not expressly made and insisted upon by the United States. This case was an agreed case. The facts were agreed upon, and it was further agreed that judgment should be entered according to the law of the case. So far as it appears

in the statement and decision of the case in the supreme court, it may fairly be implied that the question of jurisdiction was waived. Certain it is that no reference whatever is made to such a question. Again, this was in a case arising upon a writ of error to a state court, and in such a case the supreme court could pass only upon such questions as the record showed were within the provisions of the 25th section of the judiciary act. See [Montgomery v. Hernandez] 12 Wheat. [25 U. S.] 132; [Murdock v. City of Memphis] 20 Wall. [87 U. S.] 590.

The question before the court, and one upon which it took jurisdiction, was the construction and effect of acts of congress which the appellant claimed had been improperly decided adversely to him. It is quite doubtful, at least, whether the question we are now considering could in such a case have been before the supreme court, whether decided rightfully or wrongfully by the state court. In Hall v. Gaines, 22 How. [63 U. S.] 144, where the writ of error was to state court, the court say: "To give jurisdiction to this court the party must claim for himself, and not for a third party in whose title he has no interest. Setting up a title in the United States by way of defence is not claiming a personal interest affecting the subject of litigation. . . . If it was allowed to rely upon the United States title in this instance, the right might be decided against the government when it was no party and had not been sued. See, also, [Verden v. Coleman] 1 Black [66 U. S.] 472; [Owings v. Norwood] 5 Cranch, 344; [Henderson v. State of Tennessee] 10 How. [51 U. S.] 311. This case (Wilcox v. Jackson) also was one in which the United States could not have suggested a title apparent solely from the record. It depended upon facts outside of a record-title. The case, too, shows plainly that with regard to property the legal title to which is still in the United States, or where the question is whether such title has passed from the United States, acts of congress are paramount to legislation by the state, notwithstanding the property is within the territorial jurisdiction of the state, and that in such case, even as between citizens, the state of Illinois could not declare that a title, inchoate and incomplete because of a patent not having issued from the United States, should be deemed as perfect a title if a patent had issued in opposition to an act of congress which says that a patent is necessary to complete a title. The case of Brown v. Huger, 21 How. [62 U. S.] 305, came before the supreme court upon a bill of exceptions from the circuit court of the United States for the Western district of Virginia. [Case No. 2,013.] In the exceptions there is nothing whatever relating to the question before us here, and there is not, in the opinion of the court, the slightest reference to such a question. There was no objection of this kind made. In both courts the decision was in favor of the United

States, or rather of the officers holding under the United States. It is inferred, however, that because the supreme court exercised jurisdiction in a case where the fact appeared that the property was in the possession of the United States, therefore it can have jurisdiction in a case like this. This inference results partly from failing to distinguish from the want of jurisdiction in regard to subject-matter when consent cannot give jurisdiction, and want of jurisdiction on account of the character of parties affected where consent may give jurisdiction. In the latter case, if the point is not made, consent may be implied. It was not made in the case we are now considering. The court could only hear the questions made by the bill of exceptions and assignment of errors. It is assumed that because the court passed upon these that such a decision is equivalent to an express declaration that the court below had jurisdiction. But in the Dred Scott Case, 19 How. [60 U. S. 393], it is expressly held that the supreme court may, in cases coming from the United States circuit court, pass upon the law and merits of the case when the court below had no jurisdiction whatever. Such an assumption, therefore, by no means necessarily is sustained by the fact that the court discusses the merits of the case, especially in a case where the question of jurisdiction is not raised in either court, and where the court could only pass upon questions raised by the bill of exceptions and assignment of errors. In this case, also, the United States was not in a position where it could have suggested a record-title. The question was as to the boundaries of the property described, and one which rested upon extrinsic facts. Any suggestion would have at once presented the very issue to be passed upon by the jury. In the case of Grisar v. McDowell, 6 Wall. [73 U. S.] 363, precisely the same observations may be made as in the case of Brown v. Huger, last considered. Both cases came before the supreme court upon bills of exceptions taken by the plaintiff in the court below, in none of which was any reference to the question we are considering, and it would have been not only entirely unnecessary to have alluded to this question, especially as the exceptions were not sustained and the judgment was therefore properly affirmed, but it would have been a work of supererogation, uncalled for, and improper according to the practice of the court upon a hearing of bills of exceptions, where the only question is whether upon these the plaintiff in error is entitled to a new trial, and the merits of the case are not before the court; and, according to the decision in the Dred Scott Case, it was proper to pass upon the questions, though the court might have thought from the facts before it that the court below would have had no jurisdiction if the question had been made. It will be remembered that the practice of the

supreme court requires the plaintiff in error to assign errors, and the court will not hear argument nor pass only upon the errors assigned. The case of Cooley v. O'Connor, 12 Wall. [79 U. S.] 391, also arose upon a bill of exceptions, in which no reference was made to this question, nor did it appear in the assignment of errors, nor was the point made in any way, and of course no decision was made upon it. In that case also the United States was not in possession of the property, nor was it in government use. None of these cases are therefore any authority upon this point whatever.

There are some cases decided by state courts no doubt adversely to some of the principles we contend for here, and I will notice such as have been called to my attention. In the case of Wilcox v. Jackson, 13 Pet. [38 U. S. 498], already referred to, the court below, in 1 Scam. 344, held that in that case a suit could be maintained in ejectment for the recovery of property in the possession of officers of the United States. The same was held in Dreux v. Kennedy, 12 Rob. (La.) 502, and in Polack v. Mansfield (1872) 44 Cal. 36. In regard to these, I will say, first, that they are authorities entitled to such respect as the reasoning on which they are based appears to demand. They are not binding upon this court, and are only persuasive. If they are contradicted by authorities, as they are equally entitled to respect (see People v. Ambrecht, 11 Abb. Pr. 97, and the English cases cited), then, viewed simply as authorities, they have but little weight. If the principles on which they are founded are shown to be erroneous by decisions of the supreme court of the United States which are binding upon this court, as we think we have shown, then these state authorities must fall. One thing is certain, the reasoning upon which they are based throws no light upon the subject to one who has examined the subject in the light of the authorities, both English and American, heretofore cited by us. None of them show by internal evidence a thorough investigation of the subject. None of them show that a single English authority was cited or considered. They rely upon cases which we have already fully discussed, and show upon their face that they have misapprehended the full force and effect of those cases. For example, in the California case the decision is based upon the idea that, in the cases of Meigs v. McClung, Wilcox v. Jackson, and Grisar v. McDowell [supra], the supreme court of the United States passed upon the merits of the cases; whereas, as we have already shown, it did no such thing, but only passed upon the bill of exceptions and the assignment of errors in the cases. In Dreux v. Kennedy, the decision was based upon the cases of Wilcox v. Jackson and Osborne v. Bank of U. S. [supra], which we have fully considered, and certainly throws no new light upon those cases. As mere weights by force of the rea-

soning contained in them these authorities are not intrinsically very ponderous, and in this light only can they have influence here. I say this without disrespect to these authorities, for all authorities which are not binding ought to be tested by this rule. The true judicial mind is controlled by reasoning rather than by authorities of other independent courts. It may be said in regard to these cases also that in none of them could the United States have suggested, as we have here, a title of record. That was the very question involved on the merits of the case, and which could not have been suggested. In the Louisiana case, the United States retained only a usufructuary interest for a period depending upon the occurrence of a certain event, and the legal title was in another, which title was the subject of controversy.

I now call attention to the fact that in no case cited or which can be cited has the question we are discussing been presented to the court in the manner it is presented here. In no case has the question been presented directly by the United States; but in all of them the question, when made, has been by the party to the suit. Here it is raised by the United States itself, or by the attorney-general representing the United States, the real party affected by it, and who, it may be contended, is the only party having a right to make this question. As we have before said, the want of jurisdiction claimed by us relates to the character of the party rather than to the subject-matter of the suit. It is of that nature which may be waived either by consent or possibly by implication, if it is not expressly set forth and insisted upon. For the sake of argument, though without admitting it, it may be that no one but the United States itself or its law officer in its behalf, can object to the jurisdiction of the court upon this ground. That being personal to the United States alone, an individual who is sued and over whom the court has jurisdiction has no authority to and cannot set up this prerogative in behalf of the United States. If this be so, this of itself would be a complete answer to all the authorities which have been cited for the plaintiffs reviewed by us. But in such case the question then arises whether the United States can, in the way it has here, effectually interpose and set up its exemption from the jurisdiction of the court without consenting to become a party to the suit, which would of itself be a waiver of the very point it appears for the purpose of making before the court. Has the United States the right to be sued without becoming a party and without submitting to the jurisdiction of the court? As an original question, this would not be, it must be confessed, an easy question to answer. But fortunately this problem has been solved for us both in the English and American courts. The case of Doe v. Roe, 8 Mees. & W. 579, is an

exact precedent for us in every particular, and justifies our course in all respects. It is not necessary for us to reason upon it. It presents a case where no analogies in cases between individuals can be of much assistance. Such a solution seems to result from the necessities of the case, for in some way the right of exemption from suit should be protected, without being destroyed in the very act of asserting it, when, unless it is done, the court is indirectly about to deprive the sovereign of the benefits of such a right of prerogative. It was therefore held in Florida v. Georgia, 17 How. [58 U. S.] 478, that the attorney-general of the United States had the right to intervene in a suit between these states, and, to present the case of the United States, "to adduce evidence, written or parol, to examine witnesses and file their depositions," and to be heard upon the questions affecting the United States, without becoming a party to the cause; and this although the court had no jurisdiction over the United States and could render no judgment by which it would be bound. The court say: "But the court do not regard the United States in this mode of proceeding as either plaintiff or defendant; and they are therefore not liable to a judgment against them nor entitled to a judgment in their favor. But, in deciding upon the true boundary-line, we will take into consideration all the evidence which may be offered by the United States." This authority therefore recognizes the right of the United States to present its case and assert its rights and to have them considered without submitting to the jurisdiction of the court. If this can be done for one purpose why not for another, and why not the United States assert all its rights? That case related to property in which the United States was interested, though it had neither possession nor record title, nor was it in government use. If, without any of these, the United States had the right to appear to protect its interests without submitting to the jurisdiction of the court, how much more should it have such right when all three of these are assailed? In view, therefore, of the principles and precedents of the common law as established by a series of English authorities, uncontradicted, and extending through the period of the judicial history of England; of the principles established by the supreme court of the United States, that the actual possession of the United States cannot be disturbed by judicial process in a suit commenced by an individual; of the fact that nearly all authorities may be reconciled with these principles and must be reconciled with them to prevent a direct conflict; that there can certainly be found no opposing authority in any case presented, as this is, by the United States itself, it is insisted that this court cannot consistently justify any further proceeding in this case, but must dismiss the cause.

The able and learned brief submitted by counsel for the plaintiff is not given, as much of it is covered by the opinion of the court.

OPINION OF THE COURT (HUGHES, District Judge). The first question is whether it is competent for the government of the United States to appear by suggestion, as it has done in this cause. Though I concede that the intervention of the government in this manner, in a cause pending between other parties, is unusual in our American practice, I do not see that for that reason it is inadmissible. It was sanctioned by the supreme court of the United States in the cases of Florida v. Georgia, 17 How. [58 U. S.] 478; Maxfield v. Levy [Case No. 9,321]; and The Exchange, 7 Cranch [11 U. S.] 117; as well as others which might be cited. It was allowed in the case of The Pizarro [Case No. 11,199]. I believe that intervention by this method is the settled practice in England. It was, for instance, the proceeding taken by the attorney-general, in Doe v. Roe, 8 Mees. & W. 579. On authority, therefore, I do not feel at liberty to question the right of the attorney-general to intervene by suggestion in a cause in which the government is alleged to be interested, as in this cause. Nor is there any validity in the objection that a new and side issue is introduced into the cause by this proceeding. It is nothing more in effect than another form of a plea to the jurisdiction. This plea always introduces a preliminary issue requiring to be dealt with before the cause can proceed upon the merits; and the present demurrer is, in effect, an issue of law joined on a plea to the jurisdiction, which is not anomalous and works no hardship.

We come, therefore, to the questions of law presented by the suggestion and demurrer. These are two: 1st. Whether the attorney-general's suggestion is of itself sufficient to defeat the jurisdiction of the court over the cause; and, 2d. Whether, supposing it has not that effect ipso facto, the court may look into the grounds on which that officer intervenes; in pursuance of the observation made by Chief Justice Marshall in the case of U. S. v. Peters, 5 Cranch [9 U. S.] 115: "It certainly can never be alleged that a mere suggestion of title in a state to property in possession of an individual must arrest the proceedings of the court and prevent their looking into the suggestion and examining the validity of the title."

I. I should compromise the judicial office if I were to devote any serious argument to the first of these questions. The right of every citizen to a judicial determination of a controversy affecting his liberty or property, in which he may be involved, will not be denied at this day in this country. The courts are open to the humblest citizen, and there is no personage known to our laws, however exalted in station, who by mere suggestion to a court can close its doors.

against him. I have no thought that the chief law officer of the United States, who in the performance of his duty in this cause has entered the suggestion now under consideration, claims for his action any such prerogative as that in question. But even if it were possible to conceive that such a pretension could be made, let it be answered that it is a cardinal tenet of the constitution that the judiciary are an independent branch of the government, not to be controlled in its dispensations of justice by interference from other departments, and not only empowered but bound to administer the right without fear, favor, or affection. It is useless to dwell upon these topics, but it is appropriate to recall what has been said by luminous jurists of a former era in regard to the decision of questions arising between citizens and their government. In book 2, c. 14, § 213, Vattel, has these sentences: "If any difficulties arise (on questions of contract and title between the sovereign and private persons) it is equally conformable to the rules of decorum, to that delicacy of sentiment which ought to be particularly conspicuous in a sovereign, and to the love of justice, to cause them to be decided by the tribunals of the state. And this indeed is the practice of all civilized states which are governed by settled laws." In the same spirit were the utterances of Mr. Selden, one of England's most illustrious scholars and lawyers in the time of the first Charles: "In all cases, my lords, when any right or liberty belongs to the subject by any positive law, written or unwritten, if there were not also a remedy by law for the enjoying or regaining the right or liberty where it is violated or taken from him, the positive law were most vain and to no purpose; and it were to no purpose for any man to have any right in any land or other inheritance if there were not a known remedy, that is, an action or writ by which in some court of ordinary justice he might recover it. And in this case of right or liberty of person, if there is not a remedy in the law for regaining it when it is restrained, it were of no purpose to speak of laws that ordain it should not be restrained." 3 How. St. Tr. 95. If the hereditament of an English subject could be taken and held by the king without question in the courts, the notable words which the elder Pitt pointed at George III., would have had no truth or meaning: "The poorest man may, in his cottage, bid defiance to all the force of the crown. It may be frail; its roof may shake; the wind may blow through it; the storms may enter; the rain may enter; but the king of England cannot enter; all his forces dare not cross the threshold of the ruined tenement." Speech on the excise act. If there could be no judicial inquiry into the government's possession of property claimed by the citizen, what could be said of the clause in the fifth amendment to the constitution, forbidding that private property shall be taken for public use without just compensation, except that it was a meaningless form of empty words, a delusive safeguard against public wrong, a deceptive guarantee of private rights. The only alternative which would be left to the plaintiff, if this suggestion should prevail as confessed by counsel for the government, would be what Mr. Justice Grier once characterized as "the hopeless remedy of a petition to congress." The effect would be to defeat a judicial adjudication of the rights of parties and refer the plaintiff's claims for political determination to a political tribunal. If the fact be as implied by the suggestion, that there is no method known to the judicature of the country by which the rights of parties to this action could be judicially determined, it would be a reproach to American jurisprudence. In every sense would the result in this cause be unfortunate So much of sentiment, so much of sectional sentiment invests this estate of Arlington, at once the burial-ground of soldiers who lost their lives for the Union and the patrimony of the Lees, that it were in the highest degree desirable that its title should have a judicial determination rather than be relegated to the debate and vote of a popular assembly, always more or less liable to the influences of partisan passion. It would, therefore, be somewhat excusable in the court if it should apparently, in its consideration of the suggestion of the government, lean in favor of retaining its jurisdiction of such a cause as that at bar.

II. I come now to look into the grounds on which the attorney-general, through counsel here, claims that the court should stay its action and dismiss the cause. It is conceded on all hands that the sovereign power in this country, whether it be a state or the United States, cannot be made a direct party defendant in any action, except by its own consent, given generally by statute, or specially by its authorized law officer. And the question here is, whether it can be made so indirectly; and, in the present instance, whether the United States can be made so indirectly in an action brought against defendants who are the occupants of lands which it claims to own. Conceding under protest that the law may be against them on this broad proposition, counsel for the government themselves narrow this latter question, and say that even though a suit may be brought indirectly against the United States, yet that it cannot be where the proceeding takes the form of an action of ejectment, brought against defendants who are occupants of lands which the government claims by prima facie title of record, of which it is in actual possession by its officers, and which it claims to be actually using for public purposes. Such is the exact pretension made in this cause by the government.

On the part of the plaintiff it is contended

that the government does not hold the Arlington estate as a sovereign, for the reason that the jurisdiction of Virginia over it has never been surrendered; but that it holds it only in a corporate capacity, by the same tenure as, and with no other prerogative than that by which a private corporation or citizen would hold the land in Virginia. I am not sure that the inquiry is material; but, in deference to the views of counsel, I will consider these respective pretensions in the light of the facts of the record. How does the government hold this property? By whom and for what public purposes? And does it hold it in its sovereign or corporate capacity? The estate consists of eleven hundred acres. Less than a fourth of it—two hundred acres—is set apart as a national cemetery. This parcel is undeniably occupied by an officer of the government, and used for a necessary public purpose—a purpose, indeed, which no individual in the land would be willing to see defeated. The rest of the land, nine hundred acres, is occupied by some two hundred people, whom I judge from the record to be poor people, as every one but two or three signs his name with an attested cross-mark. Of all the occupants of this nine hundred acres, only one (R. P. Strong) is shown to be an officer of the government. They are mostly tenants of the government, but paying no rent. The record shows that this land was not, until as late as 1872, "set apart and held as a military post and reserve connected therewith," and directed to be "considered a military reservation pertaining to Fort Whipple." For this land the government seems to have so little use, that it allows it to be occupied for their own purposes, probably in mere charity, by nearly two hundred people in the humblest walks of life. Is it in fact a military reservation connected with a military post? Can it be more than "considered" so? A military post is a place at which troops are posted or intended to be posted, and without the troops, or the probability or the intention of troops being posted on it, a tract of ground cannot be a military post. Laying out the plan of a city in a forest, and calling it a city, does not make it so; it remains a forest still. In the theoretical sense only is Fort Whipple a military post, and the lands around it a military reservation. The surface of Virginia is studded over with such "forts," and the only happy thought connected with them is, that they are forts no longer. It is so in fact with Fort Whipple, and it is a painful anachronism now to "consider" it as still a fort. Yet, the name Fort Whipple implies that it was intended as a missionary, rather than a military post. Not only is the land thus set apart and directed to be considered a military reservation, almost wholly occupied by persons who are not agents or officers of the government, but the government has shown in another way how little real bona fide use it has for it. I consider that I may allude to the acts

of congress as part of this record, for the judicial mind dwells in the laws of the country, and that of the federal courts in the statutes of congress, from which they derive all their jurisdiction. The action of these courts is wholly based on the statutes, so that the record of such a court is a palimpsest originally inscribed with the statute law of the subject, overwritten with the proceeding in the particular case. In 14 Stat. 589, is an act of congress within the judicial cognizance of the court, releasing about eighteen acres of this land to Maria C. Syphax without consideration. Of course it cannot be contended that either this parcel, or the eight hundred and eighty-two acres which is directed to be considered as a military reservation, is in any but the nominal use of the government. Justice is figuratively thought to be blindfold; but it cannot be supposed that a court of justice sitting in Alexandria, in full view of this reservation, can by any reasonable fiction (the matter entering as an element in a question which it is called upon to decide) regard this military post, called Fort Whipple, as really occupied by the government for a military purpose. But there is what seems to me conclusive evidence that the government is not treating or using this reservation as a permanent acquisition of land for any purpose. Section 355 of the Revised Statutes, forbids the acquisition of real estate by the government for any permanent military purpose until a perfect legal title and cession of state jurisdiction shall first have been obtained. All reservations of military lands in the Western states are for a more or less temporary purpose. The term military reservation has come to be synonymous in that part of the Union with temporary reservation for military purposes. The requirements of section 355 are, I believe, never complied with in regard to those reservations, because they are deemed temporary properties of the government, temporarily used, and they are reserved from public domain acquired by the government by treaty, as a sovereign power. The requirements of that section have not been complied with in regard to the parcel in question of the Arlington estate embodying eight hundred and eighty-two acres. It is not now occupied by troops, and the fact that the requirements of section 355 have not been obeyed, nor the authority conferred on the president by section 1838, himself to obtain from the state a cession to the United States of its jurisdiction, has not been exercised, seems to prove that the government has and has had no real intention of occupying that property with troops. I therefore conclude that nine hundred acres of the Arlington estate are not in actual bona fide government use, and that the only practical uses to which it is devoted in fact are those enjoyed and exercised by the two hundred poor people who live on the premises gratuitously. I am not aware of any express law, and I doubt if there be any law, authorizing any of-

ficer of the army of the United States in a time of peace to "set apart as a military post and reserve in connection therewith," to be "considered as a military reservation," any considerable tract of land in the old thirteen states, where there are no "public lands," and where the government has no actually used military post, without a previous compliance with the requirements of section 355. In respect to this nine hundred acres, I think the pretension of the counsel for the government is unfounded, either that it is occupied by officers or agents of the government; or that it is actually used by the government for any but nominal government purposes; or that the government has title in it in its sovereign capacity; even though it should be found to have such title in its merely corporate character.

In the foregoing inquiry I have unavoidably, to some extent, overstepped the showing of the record, but I have gone into an examination of the uses made by the government of this property, more in deference to the estimate of the importance of the matter expressed by counsel for the government, than from any opinion of my own that it can affect the decision of the cause. It will be seen in the end that the principles of law governing this decision apply as conclusively to the smaller portion of the estate, embracing the cemetery, as to the larger portion of the estate occupied by its miscellaneous throng of defendants. I return to the parcel of two hundred acres set off as a national cemetery; and I cannot but regret that the title of property so hallowed in the minds of patriotic people as that now under contemplation should have been left in such doubt as to fall under the cold, inexorable scrutiny of a court of law. If sections 4870–4872 of the Revised Statutes, be examined, it will be found that they contain specific directions as to the manner in which an exclusive title in the United States in lands intended as cemeteries shall be obtained, and the exclusive jurisdiction of the United States over them shall be secured. Their provisions have not been availed of in respect to the Arlington Cemetery. Nor has the requirement of section 355 been complied with, nor the authority conferred by section 1838 exercised. The title in this property is held by the United States merely as if it were an ordinary purchaser without the authority of a sovereign over it, or the prerogatives of a sovereign to protect it. The case of the cemetery tract differs from that of the reservation not at all in regard to the legal or political title, and only in the fact that it is actually used for a necessary, I will add sacred, public purpose. In regard to the whole Arlington estate, the title of the United States is in the condition alluded to by the chief law officer of the government, in 14 Op. Attys. Gen. 200, in a letter written to the secretary of the treasury, instructing him in these words: "In regard to lands owned by the United States, within the limits of a state over which the state has not parted with its jurisdiction, the United States stand in the relation of a proprietor, and the local officers have, in my opinion, the same right to enter upon such land, or into the buildings located there, and seize the personal property of individuals for non-payment of taxes thereon, as they have to enter upon the land or into the buildings of any other proprietor for the said purpose, it being understood in the former case that the right must be so exercised as not to interfere with the operations of the general government." The tenure by which the United States holds the Arlington estate is described by Vattel in a passage quoted by counsel of the government, wherein that writer says: "What is called the high domain, which is nothing but the domain of the body of the nation or of the sovereign who represents it, is everywhere considered as inseparable from the sovereignty. The useful domain, or the domain confined to the rights that may belong to an individual in the state, may be separated from the sovereignty, and nothing prevents the possibility of its belonging to a nation in places that are not under her jurisdiction. Thus may sovereigns have fiefs and other possessions in the territories of another prince. In these cases they possess them in the manner of private individuals." It was said by Judge Story in U. S. v. Cornell [Case No. 14,867]: "Although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction of sovereignty of such state over the land so purchased. It remains until the state has relinquished its authority over the land, either expressly or by necessary implication." In Com. v. Young, Brightly, N. P. 302, it was held that "the constitution of the United States prescribes the only mode by which they can acquire land as a sovereign power, and therefore they hold only as an individual, when they obtain it in any other way." To the same effect is the decision in the case of People v. Godfrey, 17 Johns. 225. In Renner v. Bennett, 21 Ohio St. 431 (decided in 1871), it was held that where the United States, without the consent of the state, purchases and uses land for any of the purposes specified in section 8, art. 1, of the federal constitution, it acquires no jurisdiction over the land. In the case of Com. v. Young, it was held that the sale, by public outcry, of lands of the United States over which the state jurisdiction had not been ceded, in violation of a state law requiring that lands should be so sold by an auctioneer commissioned by the governor, was invalid. It seems clear to me that the government holds the Arlington estate by private and not by sovereign tenure, and that it is holding only two hundred

acres of it by an officer for a necessary public purpose. Therefore I think that the pretension of counsel for the government, that it holds the whole estate for actual public purposes by the hands of its officers, and by sovereign tenure, is quite inadmissible. The government acquired the land under authority of a loose law passed in 1863, when the times were much out of joint; but it does not hold it in observance of and compliance with the requirements of any law upon the statute-book prescribing the manner in which its title to and authority over the lands shall be secured and perfected.

I come now to consider the question whether the government can be sued indirectly in the manner in which it is sued in this action for real property held as just described. I have brought to the investigation of this question an earnest solicitude to decide it aright, because, as must be known to every lawyer, on its decision the title of the government to Arlington, in all probability, depends. There stands in the background of this suggestion and demurrer the fact that the tax titles derived by purchasers at the tax sales made by Commissioners Hawxhurst, Watson and Foster have been overthrown and held void by the supreme court of the United States in the two cases of Bennett v. Hunter, 9 Wall. [76 U. S.] 326, and Tacey v. Irwin, 18 Wall. [85 U. S.] 549. Under these decisions as many as eighteen or twenty actions of ejectment have passed under the supervision of this court, in proceedings to which the defendants have not thought it worth while to make contest. An instance of one of these cases may be found in Lee v. Chase [Case No. 8,185]. Since the decision in Tacey v. Irwin no holder of land acquired from Hawxhurst, Watson and Foster has made defence until now; and it is known to the bar that there can no defence be made in this case except the one now under consideration, to wit, that the government is not amenable to suit in the indirect form employed in this action. The commissioners who have been named adopted a rule not to receive the taxes due on property advertised for sale unless tendered by the owner in person. This rule was so rigidly enforced that neither friend, relation, nor agent was allowed to pay taxes due for the absent owner; their application to pay and save the property from sale being uniformly refused by the commissioners under the operation of the rule in question. In Bennett v. Hunter [supra] it was insisted, in support of the tax deed, that the right to pay the tax before sale was limited to the owner in person, and could not be exercised by the tenant in possession, who had offered to pay it. This position was not sustained by the court, which held that payment of the tax which the act requires to be made by the owner need not necessarily be made by him in person. It held that it was enough if it be made by any person for him;

and this on the ground that an act done by one for the benefit of another is valid, if ratified either expressly or by implication, and that such ratification will be presumed in furtherance of justice, and the court held the tax sale to be void. In Tacey v. Irwin [supra] where there had been no tender of the tax by the owner or other person, the court said: "It is difficult to see how, upon the case as found here, the sale can be sustained. The law does not require the doing of a nugatory act, as would have been a formal tender of payment, after the action of the commissioners declining to receive the taxes from any person in behalf of the owner. Bennett v. Hunter decides that the owner has the right to pay either in person or through any one not disavowed by him who was willing to act for him. This right the commissioners, by the rule which they established and the uniform practice under it, effectually denied. The friends and agents of absent owners were informed that it was useless to interpose in their behalf, and unless the owner appeared in person and discharged the tax the property would be sold. This was equivalent to saying that a regular tender by any other person would be refused. While the law gave the owner the privilege of paying by the hands of another, the commissioners confined the privilege to a payment by the owner himself. This was wrong, and a denial of the opportunity to pay accorded to the owner by the act; and the lands were therefore not delinquent when they were sold. If an offer in a particular case, to pay the tax before sale, and refused by the commissioners because not made by the owner in person, rendered a subsequent sale by the commissioners void, surely a general rule announced by the commissioners that in all cases such an offer would be refused must produce the same effect. Such a rule of necessity dispenses with a regular tender in any case. In the absence of any proof to the contrary, it is a legal presumption that the tax in this case, though not actually offered, would have been offered and paid before sale but for the known refusal of the commissioners to accept any offer when not made by the owner in person. If so, the commissioners were not authorized to make the sale in controversy, and the judgment must be affirmed."

It is plain, therefore, in the light of these decisions of the supreme court of the United States, that the tenure of the government in the Arlington estate depends upon the success of its present endeavor to defeat a judicial trial of this cause upon its merits; and there can be no doubt but that the attorney-general was bound under the impulsion of a supreme duty to intervene by suggestion to test the jurisdiction of the court. The pivotal question on which the government's title to Arlington must stand or fall is therefore the one which I am now to consider. Can the government be indirectly sued in this ac-

tion? This suit is brought under the laws of Virginia. See Code 1873, c. 131, pp. 958-963. It is a statutory action of ejectment. The ejectment law of Virginia is a copy of that of New York. Under it the action of ejectment may be brought to try the right of possession, serving thereby the purpose of the English action of ejectio firmae; and it may be brought to try the right of property, thereby standing in lieu of the English writ of right. The law of Virginia provides expressly that this statutory action of ejectment may be brought in the same cases in which the writ of right could before be brought. The present action is brought in a case in which the old English action of ejectment would not lie. It is brought by a remainderman after the termination of the life estate, where there was disseisin of the life tenant during the life estate. The right of entry had been lost, and the right of entry was necessary to the old action of ejectment. Under the statutory action given by the Virginia law no entry is necessary. None was necessary in these suits, process having been served by mere notice, and therefore there could not, in respect to these lands claimed by the government, be, as in England, either in fact or fiction an intrusion or possible collision with the king's officers by entry. In all these respects it differs materially from the English action of ejectment of Blackstone's day; and counsel for the government is mistaken in supposing with Tidd and Runnington that even the English ejectment was an action in rem, requiring seizure of property on mesne process. The English action of ejectment did not lie for one who had, like the plaintiff in this case, lost the right of entry. The right of entry was necessary to it, and entry, actual or theoretical, was the proper step for commencing it; but there was no seizure in limine as in actions in rem. The action of ejectment in England was, 1st. In its origin a mere personal action for damages. 2d. By degrees it became a mixed action to recover damages and estates for years. 3d. When it had begun to be used for the recovery of freehold estates it became a real action; for our ancestors in their high regard for freehold estates were not willing to divert the mind of the jury from the complicated questions of title to the consideration of the infinitely less important matter of damages. Thus ejectment was certainly in its origin no proceeding in rem; in its subsequent use it could no more be called a proceeding in rem than any other real action, and it would now be no less absurd to consider it as such than it would be to take that view of detinue brought to recover a specific horse, or debt to recover a specific sum of money. 2 Brown, Civ. Law, 111; Percival v. Hickey, 18 Johns. 257; 2 Kent, Comm. 378; 4 Minor, Inst. 79 (lithograph). It was for the reason that the English action of ejectment required entry and dis-

seisin as a means of commencing it, either actual or theoretical, that it did not lie against lands of the king; for it could not be commenced without intrusion upon the king's possession. But the present action, as before said, though bearing the name of ejectment, is in effect equivalent to a writ of right, not requiring to be commenced by entry and disseisin, either in fact or fiction. The law of the local sovereignty in which this land lies gives to the citizen this right to try his right of property in lands by a proceeding which disturbs the possession and offends the dignity of no claimant whatever. It authorizes a suit to be instituted to try the title, by peaceful notice given to the actual occupants of the land, and leaves it entirely in the volition of the claimant, whoever he be, to appear or not as defendant in the suit. Section 5 of the law provides in terms that "if a lessee be made a defendant at the suit of a party claiming against the title of his landlord, such landlord may appear and be made a defendant with or in the place of the lessee," if he chooses. Thus, in case the landlord be the government, the action may not only be commenced, but prosecuted to judgment, without any disturbance of the possession of the government, or "interference with its operations," or even service of mandatory process upon its officers. The action may be brought against the state of Virginia.

## State of the Law in Respect to Suits for Personal Property.

But first, I will review those decisions which relate to personal property where it has been the subject of suit, or has been directly sued for, in proceedings to which the government of a state or of the United States was not directly, but was indirectly, defendant to the action. First, as to the leading case,—The Siren, 7 Wall. [74 U. S.] 152. The steamer Siren was captured in the harbor of Charleston by a naval vessel of the United States while in the act of violating the blockade of that port, and was lawfully a prize under the law of nations. She was brought into the port of Boston, and while on her way there committed a maritime tort by running into and sinking another vessel. Being lawful prize and property of the United States, she was libelled by the government merely to obtain a judicial verification and certification of its title, and for a sale on its account, pursuant to certain provisions of law. While in the custody of the court, the owner of the sunken vessel intervened by petition, asserting a claim upon the Siren and the proceeds of her sale, for the damages he had sustained. The district court refused to grant the prayer of the petition on the ground that the Siren and the proceeds of her sale, being the property of the United States, were exempt from legal process at the suit of the intervenor, because, to allow the intervention

would be to allow the citizen to implead the government. But the supreme court of the United States reversed the district court and allowed the damages for the maritime tort claimed by the petitioner. The court stated (page 159) that the fact that the government was exempt from a direct proceeding in rem against the vessel while in its custody, was no ground for holding that it was exempt from the indirect proceeding. Yet this case is cited by counsel for the government in support of their proposition that the government can not be sued indirectly; and I understood the district attorney to express a willingness to stake the fortunes of his cause in the present suit upon that decision. His confidence resulted from relying upon expressions of the court, detached from the context, rather than upon the principle decided; for it is true, as the district attorney recited, that Mr. Justice Field, who delivered the judgment of the court, did make use, in the course of his decision, of this expression: "As justly observed by the learned (district) judge who tried this case, there is no distinction between suits against the government directly and suits against its property"—an expression the judicial import of which will appear in the sequel.

### The Nature of Proceedings in Rem.

Before going further in this line of inquiry, let me examine the nature of an admiralty proceeding. Any one having a claim by maritime contract against a vessel afloat may file a libel (a little book) in a maritime court within whose jurisdiction the vessel may be, setting out his claim, and praying her arrest. Thereupon issues process in rem; that is, against the thing, the vessel by her name: the Mayflower, for instance; which is seized and brought into custody of the court, whereupon the owner of the vessel is allowed a day to answer. The res or vessel being thus in judicial custody, all other persons having claims against it by maritime contract are allowed to come in, by libel or petition, and submit them to the judgment of the court. And, by our law, under the forty-third rule in admiralty, any person who may have an interest in the proceeds of the sale of the seized vessel, whether by maritime or other contract, may come in with like purpose. Thus it is apparent that a proceeding in admiralty presents the scene of a group of suits; of suits in rem, suits against the thing, the vessel; in which the owner is indirectly defendant, and the several libellants and petitioners are independent and distinct actors or plaintiffs. Accordingly, if the government of the United States be the owner of the libelled vessel, as it was in the case of The Siren [supra], the government is indirectly sued, not only by one plaintiff, but possibly by half a dozen plaintiffs. In The Siren Case, it had been decided below by the United States district court that there could be no intervention by petition or libel against property belonging to the government; but, as before stated, it was there held by the supreme court, that such suit would lie; and decree was given in favor of the claimant for damages sustained by the collision. It will not do, therefore, from that decision, where the government was sued indirectly, and where its property was the direct subject of judicial proceeding, to quote any expression employed by the court as authority against the very jurisdiction which the court was in the act of exercising. Previously to this case, that is to say in 1865, had been decided, the leading case of The Light-Boats (by the supreme court of Massachusetts) 11 Allen, 157. That was, of course, not an admiralty suit. It was a statutory proceeding very similar in character to an admiralty suit, taken to enforce by attachment in rem a mechanics' lien given by the state law. Certain boats intended to be used for floating lights on the Potomac during the Civil War had been built for the United States at New Bedford, Mass., by contract; the contractor had received the price, and they had been delivered to the government, and were in the custody of the officers of the United States, with crew and provisions on board, awaiting their armament, but they were still at the builder's wharf. It was while thus conditioned, and in custody of the government, that they were seized on attachment by a state officer. The petition alleged that the United States were the owners of the vessels, and prayed that notice should issue to the United States "that they appear and answer thereto." The vessels were the lawful property of the United States; had been fully paid for, and were in their actual custody by voluntary delivery. After an exhaustive review of all then existing authorities on the subject, the supreme court of Massachusetts held that "after the vessels had once come into the possession of the United States, for public purposes, they were subject to the exclusive control of the executive government of the United States, and could not be interfered with by state process," and that the attachment of them was illegal and void. But the court prefaced this judgment with the following remarks: "The petitioners suffered the title to pass into the possession of the United States, before they took one step in the state courts to establish their lien. If they had filed their petitions and attached the vessels before they came into the possession of the United States, they might well have contended that the court of the commonwealth had acquired a jurisdiction of the case, which could not be divested until the object of the suit was accomplished. This process does not wait for final adjudication of the rights of the parties before it takes the property out of the hands of its owner and possessor; but assumes the custody at the very first stage of the proceedings." This latter language was used by the court after having stated that the contractor had been paid by the government, by instalments, the contract

price of the vessels, as the work progressed, and had been fully paid before the attachment had been levied. The language which it employed was used, therefore, in respect to property wholly owned by the government. The result of this decision is, that though government property may be seized under mesne process of the court before it comes into the government's custody, yet it cannot afterwards be thus dealt with when the process of the court originating the suit would wrest the property from the possession of the government's officers. To the same effect was the decision of Judge Shipman in the case of The Thomas A. Scott, 10 Eng. Law T. (N. S.) 726, a public armed vessel libelled during the war.

There are many cases in which it has been held that libels in admiralty, or attachments in rem on mesne process will not lie against property owned by the government, and we are driven to ascertain the principle which discriminates cases in which such proceeding will lie, from those in which it will not lie. That principle is distinctly set forth in the case of The Davis, 10 Wall. 20; a case which is the more important from the fact that the opinion of the supreme court was delivered by Mr. Justice Miller; from its having been rendered on appeal from a decree of Mr. District Judge Shipman, who, I believe, had never before been reversed; and from its having been rendered after the decision of the supreme court of Massachusetts in the leading case of The Light-Boats, to which I have already alluded. Let it be borne in mind that a proceeding in rem in admiralty courts, or by attachment in other courts, is commenced by the seizure of property into the custody of the court, and that execution is virtually had on mesne process, at the beginning of the suit. The principle decided in the case of The Davis [supra] was this: that an admiralty court may enforce a lien in a proceeding in rem against the personal property of the United States in any case where the marshal, in executing mesne process, does not interfere with any officer or agent of the United States; does not destroy the possession of the United States; does not, by putting the government out of possession, reduce it to the necessity of becoming plaintiff or actor in court to assert its claim to the property. The government had shipped, in 1865, a quantity of cotton from Savannah to its agent in New York, on the schooner Davis. During its voyage the vessel and its cargo fell into the perils of the sea, and were saved from destruction by salvors; so that, afterwards, she came safely into her port of destination. The cotton (as well as the vessel) was at once regularly libelled by the salvors, as is usual in such cases, and was seized by the marshal of the court, of course, on mesne process. It was objected in the admiralty court that this was, in fact, a proceeding indirectly against government, the cotton being confessedly the property of the government. Mr. District Judge Shipman held, in the admiralty court,

that the master of the schooner was, as to the cotton, the agent of the government; that the marshal's seizure of it was a dispossession of the government; and that, therefore, the libel could not lie as to the cotton. But the supreme court of the United States held otherwise. It held that the master of the schooner was a common carrier, and not a mere agent of the government, and that seizure of cotton while in his custody was not a dispossession of the government. It held that, though this was an indirect suit against the government, yet the court might properly proceed to adjudicate upon the lien of the salvors, and to decree out of the proceeds of the sale of the vessel the amount due to them. Mr. Justice Miller, in delivering the opinion of the court, makes the following observations, in which it will be seen that he explains the sentence which we have quoted from the decision in the case of The Siren. He says: "Perhaps the two most authoritative and well-considered cases on this subject are The Siren and Briggs v. The Light-Boats. Both of these decisions assert the doctrine, after full review of the authorities, that such a lien cannot be enforced where, in order to do this successfully, it is necessary to bring suit against the United States, because the doctrine is well established that no suit can be sustained in which the United States is made an original defendant, to be brought into court by process, without some act of congress expressly authorizing it to be done. They also both assert the proposition that no suit in rem can be maintained against the property of the United States when it would be necessary to take such property out of the possession of the government by any writ or process of the court. There are some expressions in the opinion of this court in the case of The Siren which seem to imply that no suit in rem can be instituted against the property of the United States under any circumstances. But a critical examination of the case and the reasoning of the court will show that that question was not involved in the suit, and that it was not intended to assert such a proposition without qualification. * * * The learned judge who delivered the opinion cites with approval the case of The Light-Boats, 11 Allen, 157, in which the doctrine is laid down, and well supported, that proceedings in rem to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under process of the court. With the principle as thus stated we agree, and do not see in it anything inconsistent with the case of The Siren."

We have here a clear elimination of the principle of which we are in search. The learned judge did not qualify his language by confining his meaning to mesne process, but he was speaking of admiralty process, which is commenced by seizure of the res, and could have meant no other than mesne

process. The cases of The Light-Boats and of The Davis have the greater significance because they carry the liberty of indirectly suing the government farther than does the admiralty court of England. Without going into a review of the English cases of this class, I will state the result of such a review in the language employed by Judge Shipman in the case of The Davis (when it was before him), that in no case has the English court of admiralty attempted to deal adversely with the public property of the sovereign, except where there has been a voluntary appearance on its behalf, and submission of the case to the judgment of the court. Yet it is to be observed that England is notable for the absolute and unquestioning deference and subjection to law which characterizes her people and public officers in every department of society; and that the officers of the admiralty would not dare so to outrage public sentiment as to refuse to submit a right or claim of the government to the judgment of a proper court.

I will now pass from the review of those suits concerning personal property, which are commenced by a seizure of the res in contest, to those which are commenced by service of the ordinary mandatory process of the courts. The leading case in this class is the great one of Osborne v. Bank of U. S., 9 Wheat. [22 U. S.] 735. We have to do with this case only in its relation to the question whether a sovereign power may be indirectly sued. A state tax of some $100,-000 had been assessed under a law of Ohio upon the branches of the Bank of the United States doing business in Ohio. A bill of injunction was filed in the circuit court of the United States, in apprehension of a levy for the tax, praying that the auditor of the state, Osborne, might be enjoined from demanding or recovering the amount of the tax. The order of injunction was granted and served on one J. L. Harper, a state collector, "while on his way to Columbus with the money and funds on which the injunction was intended to operate;" and on Osborne, before Harper reached Columbus. The amount in the hands of Harper was $98,000. This money was delivered by Harper to the state treasurer, and by him entered on his books to the credit of the state. Its identity was preserved by its being placed in a separate package. It went afterwards into the custody of a committee of the state legislature, and was by it returned into the state treasury, where it remained during the pendency of the suit. Here was property claimed by the state as collected under its tax law, in the custody of its collector at the commencement of the suit, and in its possession as its own, by prima facie title, by deposit in its treasury standing to its credit on its treasury books. The suit was brought against Osborne, the auditor, and amended to embrace Harper, the collector, and Curry, the treasurer. It would not be possible to find a case where a state could be more positively sued in indirect form than was the state of Ohio in this case. It was only in the single particular that the state was not by name a party to the record that she was not sued. The supreme court ruled that this suit thus brought and maintained was one in which the United States court had jurisdiction. In an earnest and elaborate opinion Chief Justice Marshall spoke as follows: "In a case where a state is a party on the record, the question of jurisdiction is decided by inspection. If jurisdiction depend not on this plain fact, but on the interest of the state, what rule has the constitution given by which this interest is to be measured? If no rule be given, is it to be settled by the court? If so, the curious anomaly is presented of a court examining the whole testimony of a cause, inquiring into and deciding on the extent of a state's interest, without having a right to exercise any jurisdiction in the case. Can this inquiry be made without the existence of jurisdiction? The judicial power of the Union is also extended to controversies between citizens of different states; and it has been decided that the character of the parties must be shown on the record. Does this provision depend on the character of those whose interest is litigated, or of those who are parties in the record? In a suit, for example, brought by or against an executor, the creditors or legatees of his testator are the persons really concerned in interest, but it has never been suspected that if the executor be a resident of another state, the jurisdiction of the federal courts could be ousted by the fact that the creditors or legatees were citizens of the same state with the opposite party. The universally received construction in this case is that jurisdiction is neither given nor ousted by the relative situation of the parties concerned in interest, but by the relative situation of the parties named on the record. Why is this construction universal? No case can be imagined in which the existence of an interest out of the party on the record is more unequivocal than in that which has been just stated. Why, then, is it universally admitted that this interest in no manner affects the jurisdiction of the court? The plain and obvious answer is because the jurisdiction of the court depends, not upon this interest, but upon the actual party on the record."

In U. S. Bank v. Planters' Bank, 9 Wheat. [22 U. S.] 904, where a state was shareholder in the bank, and was indirectly a party defendant, Chief Justice Marshall said it was "a sound principle that where a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen;" and in Briscoe v. Bank of Commonwealth, 11 Pet. [36 U. S.] 257,

where the state of Kentucky was the exclusive stockholder of a bank, and was the exclusive party sued, though sued nominally as a corporation, Mr. Justice McLean held that the state imparted none of its elements of sovereignty to the bank in creating it, and that the funds and property of the bank might be reached by the legal or equitable process of a court of justice. In Davis v. Gray, 16 Wall. [83 U. S.] 203, which was a Texas railroad case, the court said (Mr. Justice Swayne): "In deciding who are parties to the suit, the court will not look beyond the record. Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind him as the real party in interest." The case of Swasey v. North Carolina R. Co. [supra] was one of the same character. There certain property of the state, in the form of railroad shares, was the subject of litigation, and I shall let Chief Justice Waite, who rendered the decision, state the objection to it and his answer: "It is insisted by the defendant that the state of North Carolina is in fact a party defendant, and consequently that this court cannot entertain jurisdiction of the cause. The state, although directly interested in the subject-matter of the litigation, is not a party to the record. The eleventh amendment to the constitution of the United States, provides that no suit can be prosecuted in this court against a state by the citizens of another state, or by citizens or subjects of a foreign state. It has long been held, however, that this amendment applies only to suits in which a state is party to the record, and not those in which it has an interest merely. It is next urged that if the state is not actually a party to the suit, it is a necessary party in whose absence the cause cannot proceed, and that as a state cannot be brought into court, no relief should be granted upon the case made. If the state could be brought into court, it undoubtedly should be made a party before a decree is rendered, but since the case of Osborne v. Bank of U. S., 9 Wheat. [22 U. S.] 738, it has been the uniform practice of the courts of the United States to take jurisdiction of causes affecting the property of a state in the hands of its agents, without making the state a party, where the property or the agent is within the jurisdiction. In such cases the courts act through the instrumentality of the property or the agent. The real question, therefore, to be determined is, whether the court has jurisdiction of the property which it is sought to charge, or of the agent having it in possession."

I will here point out the fact, that the court maintained its jurisdiction in, and heard and determined each of the suits of, Osborne v. U. S. Bank and Swasey v. North Carolina R. Co. [supra]. (to say nothing of the intermediate suits), notwithstanding

that the effect of final process of execution would be, in one case, to invade the treasury of a state and to take from the hands of its officer property (money) claimed by the state as public property, and in the other case to invade the office of a corporation acting as agent of the state, for the purpose of a compulsory transfer and sale of the state's shares in its capital stock. I point out the fact in this place only for the purpose of showing passim that the "process" contemplated by Mr. Justice Miller, in his opinion in the case of The Davis, was only mesne process. And now I deduce this principle as the teaching of the leading cases which have just been reviewed, viz.: That government may be sued indirectly in regard to personal property in actions not attended by a seizure of the property out of its officers' possession on mesne process, even though, in executing judgment on final process, such seizure and dispossession would result. If a court of justice, after a full hearing, decides that personal property, claimed by government by title on which it has judicially passed, belongs to another, it will not presume that government will fail to deliver it to the rightful owner; and it is believed that in this country, as in England, final process for restitution would never be necessary. At all events a court will not be deterred from adjudicating such a cause by the presumption that the government will not make restitution without the indecent interposition of the court's writ of execution. But suits to test the title to property manifestly differ from those brought to recover a pecuniary debt, and it is conceded that no court but the court of claims has jurisdiction to render what Mr. Justice Miller calls "a moneyed judgment" against the United States. Case v. Terrill, 11 Wall. [78 U. S.] 199. Counsel for the government speak of the impatience with which the supreme court expressed itself, of the decree which the court below (the United States circuit court for Louisiana) had rendered against the United States in this last case. The cause of the judicial impatience was that a court should have rendered a judgment "against any one not made a party to the suit, and who had in no manner," direct or indirect, "appeared in the case." Here a moneyed judgment for more than $200,000 had been rendered against the United States, though not a party, direct or indirect, to the proceedings. But even where money is the subject of judicial proceeding, it is held that a court may proceed to the point of determining what amount is due the government without regard to the fact that the power to order execution be not within its jurisdiction. U. S. v. Bank of Metropolis, 15 Pet. [40 U. S.] 377; De Groot v. U. S., 5 Wall. [72 U. S.] 419; U. S. v. Eckford, 6 Wall. [73 U. S.] 484; and many other cases. In a case, for instance, where gov-

ernment is plaintiff, and a set-off proved against it exceeds its own demand, the judgment is only that the defendant go without day. Reeside v. Walker, 11 How. [52 U. S.] 590. And "this for the reason that no officer in a republic, however high, not even the president of the United States, much less a secretary of the treasury, or treasurer, is generally empowered to pay debts of the United States when presented to him." Suits for money debts stand on a different footing from suits respecting specific personal property claimed by government. But, we. repeat, that although a moneyed judgment cannot be rendered against the government except where authorized by law, the mere fact that it cannot be, does not of itself suffice to defeat the jurisdiction of a court to ascertain what is due the citizen.

This examination into decisions of the courts could be pursued until research degenerated into pedantry; and it is confidently believed that the result of a discriminating and candid reading of them all would be precisely that derived from the leading cases already cited, namely, that courts of justice may take cognizance of actions affecting the personal property of the government of a sovereign power whenever the service of mesne process before adjudication does not involve the seizure of the property out of the hands of its officers, even though the proceeding look to a judgment, final execution upon which, if issued, would dispossess the government. Before passing on to cases involving real property, I will mention the case of Cohens v. Virginia, 6 Wheat. [19 U. S.] 264. There, I believe for the first time, arose the question whether a state, having prevailed below in a suit in which she was prosecutor by indictment, might be made defendant to an appellate proceeding for carrying the case up to the supreme court of the United States, in spite of amendment 11 of the federal constitution, forbidding suits against the states. It is hardly worth while to state that the proceeding was sustained by the supreme court.

I think now the way is cleared for an examination of the authorities which bear upon the precise question which we have in hand, namely, whether a statutory action of "ejectment," which is used in this instance in lieu of the old English writ of right, lies to test the title in lands claimed by the United States all of which the government has in possession, and a part of which, at least, it has in actual use for a necessary public purpose, the United States being only indirectly a party. The chief reliance of counsel for the government in denying such jurisdiction is upon English cases; but it is useless to say more than I have done in demonstration of the fact, that no authorities indicating the state of the law in England on the question whether ejectment will lie to recover lands held by the crown, have any application in the present case. This is only in statutory name an action of ejectment, being really in technical effect a writ of right. It was not necessary, in installing this suit, to make entry and disseisin, or to feign to do so, on lands held by the sovereign power, as it would have been under the old practice in England. There was no intrusion, actual or fictitious, on the sovereign's tenure in the incipiency of the action, and the possession of the government remains as free from actual disturbance, and its dignity from actual or intentional iasult, as if there were no suit pending at all to test its right to hold these premises. There is no doubt of the fact, that in England ejectment will not lie to recover lands in possession of the crown. There are technical reasons for this fact which, though once founded in reason, are no longer so; and there are real reasons. One of the technical reasons is, that the possession of the crown, however wrongful, is exempt from intrusion by the entry and disseisin which were deemed necessary to the commencement of ejectment. Another is, that since Edward I., or at least since James I. (Allen, Royal Prerog. 93), the practice established by the courts has required another remedy to be pursued, namely, the petition of right. So that now, in England the action of debt will no more lie where detinue ought to be brought, than ejectment where the practice requires the petition of right. The spirit of the English law, as well as the temper of the English constitution, require the suits against the soverign shall be in precatory rather than in mandatory form. But while the law and the constitution are thus far in accord, it must be confessed that there is a wide difference between the ideal king of the English lawyers, who is above law, and the real king of the British constitution, who is subject to law. He is represented in the law-books as an absolute sovereign; as, indeed, a supernatural being who never dies, who is present at one and the same time in every court of his dominions, who can neither do wrong nor imagine evil, and who is incapable of any act of impropriety, folly, or weakness. In contemplation of the lawyers the king is not only everywhere in the courts, but at the same time commands the army and navy, bestows all honors and titles, represents the majesty of the whole community at home, conducts all correspondence and negotiations abroad, makes peace or war, and binds the kingdom by contract or treaty. In their minds he is a corporation sole, he is an artificial person that never dies, he cannot be summoned before an ecclesiastical or secular court, he cannot commit treason or felony, and cannot suffer punishment or corruption of blood, nor be imprisoned or outlawed. While such is the king recognized by those of us who have studied the English law-books, those who have also studied English history know that the sovereign of the constitution is a very different character, of whom it is watchful

and jealous, whom it often denounces, frequently prosecutes, sometimes deposes, and occasionally beheads. Of such a king as that of the English lawyers we have known nothing in America for one hundred years, and it is simply idle to cite, in American courts, precedents and authorities from English courts. which, after all, merely lay down the principle that suits against the crown must, for a thousand reasons founded in English sentiment, be in precatory and not in mandatory form. Nothing is more true than that in England, for reasons which have no existence or countenance in America, ejectment will not lie for lands in possession of the crown. And it is also the case, although it was not formerly so, that the writ of right, which is not originated by entry, but is commenced by mere praecipe, will not lie. The single, sufficient reason why neither ejectment nor writ of right will lie is, that a petition of right has become, in modern practice, the proper remedy in England for suits against the sovereign. See Sadler's Case, 4 Coke, 55a; The Bankers, 14 How. State Tr. 28; Attorney-General v. Hallett, 15 Mees. & W. 106; Doe v. Roe, 8 Mees. & W. 579; Hovenden v. Lord Annesley, 2 Schoales & L. 617; and 1 Anstr. 215. The nature of this proceeding is nowhere more succinctly and fully explained than in 4 Minor, Inst. 667, as follows: "This is a proceeding in chancery, originating at common law, it is said, under the auspices of Edward I. used where the king is in full possession of any hereditament or chattels, and the petitioner suggests such a right as controverts the title of the crown, grounded on facts disclosed in the petition itself, in which case he must be careful to state truly the whole title of the crown, otherwise the petition shall abate, and then upon this answer being indorsed on the petition of the king, soit droit fait al partie (let right be done to the party), a commission issues to inquire of the truth of this suggestion; after the return of which the king's attorney is at liberty to plead at bar, or to demur, and the merits are then determined as in suits between subject and subject. And if the right be determined against the crown, the judgment is quod manus domini regis amoveantur et possessio restituatur petenti salvo jure domini regis, whereby the crown is instantly out of possession without the necessity for the indecent interposition of its own officers." 3 Bl. Comm. 256, 257; Bac. Abr. Prerogative, E; 1 Th. Co. Litt. 308 et seq., and notes N, O; Baron de Bode's Case, 8 Adol. & E. (N. S.; 55 E. C. L.) 208 (where the mode of proceeding is stated). In the Case of the Baron de Bode, it will be seen that the court exhibited a disposition to enlarge and extend the scope of the petition of right, rather than to narrow it. The truth is, that all the learning which is cited from the English reporters, showing that other remedies will not lie against the sovereign, and that petition of right must be resorted to, at the same time shows that the sovereign may be and is habitually sued in England in the form prescribed by English practice, so that it may be said, to the glory of England, that the words of John Selden and of the elder Pitt, which have been quoted, are true. In that country, probably more than any other pervaded with the spirit of obedience to law, fidelity to contracts, and reverence for the tribunals and instrumentalities of justice, there is a remedy open for every grievance. "Non recedant querentes in curia regis sine remedio." All that the injured person is required to look to is, that he seek his remedy, be it against the king or a private person, at the proper source; his remedy against the king being as open and free to him as against any other person. Mr. Broom, in his note to the Banker's Case (Constitutional Law, 241), has this just and lucid explanation of the subject of remedies in England: "The crown submits, as is abundantly proved by the cases already cited, to have its prerogatives openly discussed and investigated in courts of justice, and allows a remedy against itself for any infringement of the subject's right, provided such remedy be sought where it can be had. The constitution of England, as remarked by Lord Holt (14 State Tr. 784), 'has wisely distributed to several courts the determination of proper causes, but has left no subject in any case where he is injured without his adequate remedy, if he will go to the right place for it. If a man will seek for a remedy at common law for a legacy, it is his own fault if he do not recover; as it would be if he should begin a suit for land in the court of admiralty, or go for equity in the common pleas.' And so if the subject has cause of complaint against the crown, he must proceed for redress by that pathway which the constitution has laid down for him. For an illegal invasion of his liberty he should proceed by habeas corpus; to obtain the revocation of a grant which injuriously affects him he should proceed by scire facias; for an illegal invasion of the right of property he should proceed by petition of right, speaking of which latter remedy Sir W. Blackstone (3 Comm. 255) tells us that the law has thus furnished the subject with a 'decent and respectful' mode of informing the king of a grievance, and soliciting redress. This mode of procedure is appropriate for inducing restitution by the crown of land or chattel property, of which it has through misinformation or inadvertence, wrongfully possessed itself." It is apparent from these authorities that the crown in England may be sued, and that the petition of right is the remedy supplied by the English law for an aggrieved subject, by which he may have his claim against the crown judicially determined. I do not think, therefore, that the practice, or the legal authorities, in England can with any reason be adduced in support of the attitude held by the government in this cause. Nor is the view of counsel for

government correct that the petition to congress here is the equivalent of the petition of right in England; for the petition to congress is a political remedy, whereas the petition of right is strictly judicial. The only equivalent here of the petition of right is the right given by statute to sue in the court of claims, a grant, however, which does not extend to such a claim as that of the plaintiff in the present action. Yet I will venture the opinion that the clause of the fifth amendment to the constitution, which forbids the taking of private property for public uses without just compensation, proprio vigore gives jurisdiction to the courts of suits brought directly against the government for the recovery of property, where the complaint avers that the property was taken without just compensation.

For the present case, and those of its class, there is no jurisdiction specially derived from the express legislation of congress, just as there is probably no express law of congress authorizing by name the action of debt or trespass on the case; and this being an inferior court, we must needs look to the decisions of the supreme court of the United States for that judicial legislation which supplies in the present instance the only chart by which we may direct our course. I come, therefore, in conclusion to consider those cases decided by the supreme court of the United States, in which the government of a state or of the United States has been indirectly sued in respect to lands in its possession, whether held or not for public purposes. The leading case on the subject, and the first in point of time, is that of Meigs v. McClung, 9 Cranch [13 U. S.] 11. The land in dispute was occupied by the United States as a military garrison. In a treaty settling the boundary of the territory of the Indians, and extinguishing their title to the rest, in the now state of Tennessee, the government had reserved a right to put a garrison on the Indian portion, and to use a reserve of three miles square in connection with it, but it happened that the Indian land did not extend above the mouth of the Highwassee river, and the government was unfortunate enough, through a mistake, to put its garrison above the mouth of the river on private property, and not below the river on Indian ground. An action of ejectment was brought and the process served on Meigs, the military officer of the United States in command at the garrison. The cause proceeded to judgment in the federal court below, and went up on writ of error to the supreme court of the United States. The cause was there heard, and Chief Justice Marshall delivered the unanimous opinion of the court in these words: "This court is unanimously and clearly of opinion that the circuit court committed no error in instructing the jury that the Indian title was extinguished in the land in controversy, and that the plaintiff below might sustain his action." Though it was "objected and insisted that the action could not be maintained against them because the land was occupied by the United States troops, and the defendants as officers of the United States for the benefit of the United States and by their direction," yet it does not appear from Mr. Cranch's report of the case that the question of jurisdiction was raised by plea in the court below. That point does not seem to have been relied upon by the government as a ground of error in the argument above. And so the counsel for the government in the present case, with that extraordinary and commendable diligence and alacrity which has characterized them throughout its progress, object that, as an appellate court does not consider any grounds of error but such as are relied upon in the record brought up to it, so the supreme court could not have considered this question of jurisdiction in the case of Meigs v. McClung [supra]. They cite Montgomery v. Hernandez, 12 Wheat. [25 U. S.] 130; Murdock v. Memphis, 20 Wall. [87 U. S.] 590; Venden v. Coleman, 1 Black [66 U. S.] 472; Webster v. Cooper, 10 How. [51 U. S.] 54; Brown v. Huger, 21 How. [62 U. S.] 305. But it seems to me that the question of jurisdiction is one which does not fall within the rule stated by counsel, or within the reason of the rule, and that the court below and the supreme court could not but have considered that question in the case under consideration. Whether or not the court had jurisdiction to try the title of the United States in property held as a garrison by officers and visible troops of the army, for a bona fide, patent, necessary public purpose, was, it seems to me, of the very essence of the case before the supreme court, and the language employed by the court in rendering its decision, that "the plaintiff below might sustain his action," seems to imply that, whether the question of jurisdiction which the consent of counsel cannot affect was technically before it or not, it was distinctly and expressly passed upon by it. Here the judgment was against the government. Another case of ejectment, to recover Fort Dearborn, at Chicago, a possession of the government, occupied by its army officers, for the purpose of a military station, was that of Wilcox v. Jackson, 13 Pet. [38 U. S.] 498. The action was brought in a state court, and was proceeded in there to judgment. 1 Scam. 344. It was taken by writ of error to the supreme court of the United States, and that court heard the cause and proceeded to judgment upon it. In that case the decision of the state court against the government was reversed, and a judgment for the government given by the supreme court. The judgment in each forum was upon the merits, and not upon the question of jurisdiction. The state court took jurisdiction upon the merits, and the supreme court reversed the state court upon

the merits, taking no notice of the question of jurisdiction. Counsel for government in the present case admit that the supreme court in that case "in deciding upon the law of the case decided the question of jurisdiction;" though they think that, as it was decided upon agreed facts, the question of jurisdiction was virtually waived. But can a merely implied consent give jurisdiction in such a case? Consent of counsel does not give jurisdiction where jurisdiction is of the essence of the proceeding. Mordecai v. Lindsay, 19 How. [60 U. S.] 199; Montgomery v. Anderson, 21 How. [62 U. S.] 386; and Ballance v. Forsyth, Id. 389. In the case of Grisar v. McDowell, 6 Wall. [73 U. S.] 263, the plaintiff claimed as seized in fee the presidio of the old pueblo of San Francisco, then occupied by the United States, and brought his action indirectly against the United States, who set up that the property was public property of the United States reserved for military purposes. The defendant named was General McDowell, commanding the military post, and process was served on him. The circuit court entertained jurisdiction of the cause, and proceeded in it to judgment. It was thence carried to the supreme court of the United States, which proceeded in it to judgment. The report does not show that in either court the question of jurisdiction was expressly raised. But certainly they could not have considered that the mere fact of possession by the United States and use of the property for public purposes was sufficient to defeat their jurisdiction. They looked narrowly and diligently into the grounds of the title of the plaintiff and of the United States, and they each decided the case, on the relative strength of the two titles, in favor of the United States. The fact that the property was claimed by the United States, was in the possession of its officers, and in its actual necessary use for military purposes, intruded itself into the cause at every stage, and neither court deemed this fact sufficient to defeat its jurisdiction, and each proceeded to consider and decide the case on its merits.

I now come to the latest case which has been decided in the supreme court of the United States, in which the question now before this court was brought under review. This was the case of Cooley v. O'Connor, 12 Wall. [79 U. S.] 391. The action was ejectment. It was brought to recover a lot of ground in the town of Beaufort, South Carolina, owned by the United States. Process or notice in ejectment was served on the occupants, who were tenants of the United States. It was a case in which the United States were sued indirectly, in ejectment for property claimed by government. The claim, as in the case now at bar, was founded on a tax-title obtained at a sale made durante bello by direct tax commissioners of the United States for delinquent taxes. The

action of ejectment brought was the old one of trespass quare clausum fregit, with indorsement that "the action was brought to try title as well as for damages." It was the equivalent of Blackstone's English action of ejectio firmae. It was a case to which the English authorities cited by counsel for government apply directly, and with which the English cases which they rely upon run on all fours. The government was using the lot of ground sued for, for public purposes, virtually as it is using the 882 acres of Arlington, those purposes being rather imaginary than real. The defendants were one Cooley, one Judd, and others. Cooley was the tenant of a government lessee, and Judd a clerk of the United States for certain, in his view, important purposes. From the exceptions of the defendants set out in the record, the following is an extract: "And the defendants, to maintain and form the issue on their part, gave in evidence tending to show that Samuel A. Cooley was in possession of a portion of the premises in the plaintiff's declaration mentioned, as a tenant of George Holmes, who had leased said portion of said premises from the United States direct tax commissioners at Beaufort, S. C.; that as such tenant he went into possession in June, 1867, and continued therein until about the 1st of December, 1868; that the said Henry G. Judd occupied a portion of said premises in the plaintiff's declaration mentioned as clerk of the United States direct tax commissioners at Beaufort, and by their permission and direction; that he was in possession of said premises from or about the 1st of June, 1867, until about the 1st day of December, 1868; that said Cooley and Judd, defendants, had no other right, title, or interest in said premises, except as hereinbefore set forth, being mere tenants at will, in possession, and that they derived their right to possession from the United States direct tax commissioners at Beaufort, S. C., who acted and assumed to act for and on behalf of the United States of America." Of this cause the circuit court below took jurisdiction, heard it on the merits, and proceeded to judgment. When carried up the supreme court did the same. The government had lost the case in the circuit court on an instruction to the jury. The supreme court found error in the instruction, and what did it do? Did it reverse the judgment below, and order the lower court to dismiss for want of jurisdiction by reason that the United States was the only defendant in interest? It did not. Its order, as reported, was "Judgment reversed and venire de novo awarded."

These decisions of the supreme court are supported by several cases decided in other courts of the highest authority. Mr. Justice Grier had held the same view as to the jurisdiction of a court in Elliott v. Van Voorst [Case No. 4,390]. In that case the government of the United States by some

accident of business had become the owner of the equity of redemption in some land in New Jersey, and a proceeding had been taken by a mortgagee to foreclose his mortgage. It was necessary under the rules governing chancery suits to give notice of the proceeding to the United States, standing virtually in the shoes of the mortgagor, and Mr. Justice Grier, sitting in circuit court, held that, quoad hoc, the United States held as a private person and not as a sovereign, and might be served with notice of the proceeding just as any private mortgagor or holder of his equity of redemption might be served. In Dreux v. Kennedy, 12 Rob. (La.) 489 (decided in 1846) plaintiffs sued the defendants to recover lands in Louisiana alleged to be in their possession. The latter prayed for a dismissal, averring that the property was in the possession of the United States, a branch mint having been erected thereon; that they were merely officers of the mint and not in possession of the premises and had no authority to represent the United States. But it was held that the exception be overruled, the court saying: "Where the party in possession of land, when sued for it, points out the owner under whom he holds, he is bound to defend the action if such owner do not live within the state, or is not represented therein, or if such proprietor, lessor, or principal be the United States, against whom no direct action can be brought."

In the case of French v. Bankhead, 11 Grat. 138, which was an action of ejectment, brought against the military officer in command at Fortress Monroe, Virginia, for the recovery of land of which the United States claimed to be owner, and occupied by him as such officer, and where the defendant was represented in the supreme court of appeals of Virginia—the action having been brought in the state court and never removed to a federal court—by counsel, one of whom (Jones) was at the time United States district attorney, and where it was decided in favor of the defendant, upon the ground that the United States was entitled to the property in controversy; no objection to jurisdiction was made at any stage of the case. In Polack v. Mansfield, 44 Cal. 36, decided in 1872, after deciding that a mere servant or employé, who does not claim any interest in the premises, nor any right to their possession, and only in that manner occupies the premises, cannot be sued in an action to recover lands, the supreme court of California goes on further to decide: "That the rule which thus exempts the mere servant or employé of another from an action presupposes that the employer may be sued, and that the wrongs of which the plaintiff complains may be redressed by resort to an action against the employer, as being the real party committing the ouster. In a case, therefore, where the employer is for any reason not amenable to an action, the rule referred to has no application, and the employé or ser-

vant becomes ex necessitate the proper party defendant, since he is the only party who can be subjected to a suit at all. Were this otherwise, it would result, that open and admitted violation of private right would find no redress in the courts of the country. The government of the United States as such cannot be sued as a party defendant in the courts of the state; and unless its servants and employés may be properly responsible for the lawless invasion of private property committed by them at the command of the government, the citizen is left wholly without the protection which it is the first aim and purpose of municipal law to afford."

There is but one other and very unimportant part of the case to be dealt with, and that is the intimation that in the event of the plaintiffs recovering in this action, the court would have no power to make good its judgment by final process. But the court will not imagine that its judgment would be resisted. That is a matter that must take care of itself. Mr. Justice Blair, in Chisholm v. State of Georgia, 2 Dall. [2 U. S.] 451, after alluding to this argument ab inutile and speaking of the jurisdiction of the court being questionable on the ground that congress had not provided any form of execution or pointed out any mode of making a judgment against a state effectual, said: "Let us go on as far as we can, and if, at the end of the business, notwithstanding the powers given us in the 14th section of the judicial act, we meet difficulties insurmountable to us, we must leave it to those departments of government which have higher powers, to which, however, there may be no necessity to have recourse. Is it altogether a vain expectation that a state may have other motives than such as arise from the apprehension of coercion to carry into execution a judgment of the supreme court of the United States, though not conformable to its own ideas of justice?" To the same effect were the words of Mr. Justice Grier in the case of Elliott v. Van Voorst [supra], where, in meeting the objection that there was no precedent to be found for his assuming jurisdiction of a cause, judgment on which the process of the court might be inadequate to enforce, with that practical wisdom and downrightness of speech which characterized him he said: "It is time there was one."

Is it possible, in the light of these cases, to hold, that the fact of the federal government being claimant by record-title of property which is made the subject of an indirect suit against it, in possession of the property, and in the actual use of it for public purposes, defeats the jurisdiction of a court to look into the grounds of its title and decide the action upon the merits? Sitting here, in an inferior court, I am not at liberty so to hold, because to do so would be to overrule the supreme court in all the four cases of Meigs v. McClung, Wilcox v. Jackson, Grisar v. McDowell, and Cooley v. O'Connor [supra]. I have

found it impracticable to make mention of each of the multitude of authorities which were cited in the argument of the cause. I have, however, examined them all, and think that I have adopted the teaching of most of them and done violence to that of none. In the fact that the case at bar is the only one yet arising in which this especial question of jurisdiction has been raised at the outset of proceedings, and in which the fate of the government's title has seemed to depend wholly upon this question, the present is a case of first impression. It is not to be denied that this cause is before the court in a form not heretofore known to American precedent; that is to say, it presents a case in which the sovereignty sued, comes into court, in the first incipiency of the proceeding, deigning to protest its exemption from amenability to the action, but disdaining to submit itself, as may have been done in the cases last cited, to the jurisdiction of the court. A case of such consequence will naturally ascend from this forum to the lofty and most profoundly revered tribunal of ultimate resort provided by the constitution of the United States. With firm judicial confidence I sustain the demurrer of the plaintiff in this cause, and direct that it shall proceed to trial on the issues raised by the plaintiff's answer to the attorney-general's suggestion. If, then, it shall go up to the supreme court, as I doubt not it will do, I shall console myself with the memorable reflection of Lord Nottingham, in the case of the Duke of Norfolk: "I am not ashamed to have made this decision, nor will I be wounded if it should be reversed."

[NOTE. This case was afterwards heard by the same court upon instructions asked and refused, and was tried by a jury, and verdict given for the plaintiff. Case No. 8,192. Two writs of error were prosecuted, by the defendants and by the United States, eo nomine. to the supreme court, which affirmed the decision of the lower court. 106 U. S. 196, 1 Sup. Ct. 240.]